## VALENTINE AMSTEIN *vs.* G. C. GARDNER.

Franklin.    Sept. 19, 1882. — Jan. 3, 1883.    FIELD, COLBURN & HOLMES, JJ., absent.

Under the Sts. of 1875, c. 77, 1876, c. 150, 1878, c. 191, 1879, c. 141, and 1880, c. 261, an action may be maintained against the manager of the Troy and Greenfield Railroad and the Hoosac Tunnel, for an injury to property caused by the defective construction of the railroad, under such circumstances that an action could have been maintained had the road been owned by a corporation and not by the Commonwealth, although the defective construction was the act of a former manager.

In an action for an injury to a horse caused by the defective construction of a railroad, the testimony of an expert that, in his opinion, a cattle-guard or barrier was necessary at a particular point, is incompetent.

If a horse escapes from the control of the owner's agent, through his negligence, and, after running six hundred and fifty feet, enters upon the tracks of a railroad corporation at a point where there are no barriers, and, after going on the tracks a distance of five hundred and seventy feet, is injured, if the jury find that the injury was likely to happen as a natural and probable consequence of such negligence, so that the negligence might in their judgment fairly be considered to be a contributory cause of the injury, the owner of the horse is not entitled to recover.

Tort against the manager of the Troy and Greenfield Railroad and the Hoosac Tunnel, for injuries occasioned to the plaintiff's horse by falling into the openings between the ties of a bridge in Buckland over which the railroad passed. After the former decision, reported 132 Mass. 28, the case was tried in the Superior Court, before *Knowlton*, J. The jury returned a verdict for the defendant; and the plaintiff alleged exceptions, which appear in the opinion.

*H. Winn*, for the plaintiff.

*C. Delano*, for the defendant.

C. Allen, J. The principal question in this case is, whether an action can be maintained against the defendant, as manager of the Troy and Greenfield Railroad and the Hoosac Tunnel, to recover for an injury which occurred in consequence of defective construction, which was the work of his predecessor in office; or in consequence of the omission of his predecessor to build a necessary cattle-guard or barrier to keep animals from entering upon the railroad and passing along the track or the lands on the sides thereof, the presiding judge having ruled that the defendant might be held responsible for damages caused by the defective construction of the railroad while he was manager, but not for damages caused by such construction which was the work of a former manager. It is contended by the defendant, that such liability only exists in any case for negligence or default of the manager in reference to things which he could control without going to the Governor and Council for means or authority, as, for example, the selection and employment of men, the management of switches, &c.; and especially that this action, if maintainable at all, can only be maintained against the former manager. But an examination of the statutes has satisfied us that neither of these grounds of defence is well founded.

The legislation material to be considered began in 1875. At this time the railroad and tunnel were nearly ready to be opened for business. By the St. of 1875, *c.* 77, § 1, a manager was to be appointed " to take charge of the Troy and Greenfield Railroad and the Hoosac Tunnel, and manage the same in behalf of the Commonwealth." He was to be removable at the pleasure of the Governor and Council; and, in case of a vacancy from any cause, the vacancy was to be filled by a new appointment. The

manager was to be "held responsible in person and property, for all damages sustained by any person or persons recoverable by law in consequence of the mismanagement of said railroad or tunnel, to the same extent as a railroad corporation established by this Commonwealth would be liable," and to be entitled to receive, from the earnings of said railroad and tunnel, compensation for the damages recovered against him, and costs incident thereto. By § 2, he was to supervise the completion and arching of the tunnel, "and the renovation of the said Troy and Greenfield Railroad." By § 3, the Governor and Council were to have "the said Troy and Greenfield Railroad renovated and relocated as far as they shall deem it advisable to adapt it for the transmission of passengers and freight." By § 5, reasonable tolls were to be prescribed by the Governor and Council, for the passage of cars with freight and passengers, &c.; and, in fixing such tolls, "due regard shall be had . . . . to the development of business, as well as to the cost of said tunnel." The St. of 1876, *c.* 150, § 6, provided that the manager, under the direction of the Governor and Council and with their approval, "shall have and exercise the power and authority conferred upon railroad corporations by the general railroad act" of 1874, for the purposes expressed in said act and a preceding one, viz. in renovating and relocating the road. Under the St. of 1878, *c.* 191, § 1, whenever judgment is recovered in an action for damages against the manager, under or by virtue of the provisions of the St. of 1875, *c.* 77, "no execution therefor shall be issued against the person or property of the said manager, but said judgment shall be paid out of the earnings of the road, in the hands of the treasurer" thereof; "and the manager shall be entitled to retain from the earnings of said road such sums as will be sufficient to pay and satisfy such judgment." By the St. of 1879, *c.* 141, § 1, it was provided that the treasurer of the railroad company should every month or oftener pay to the treasurer of the Commonwealth all moneys received on account of said railroad and tunnel, and should every month deliver to the auditor of the Commonwealth bills of all dues that might have become payable on account of said railroad and tunnel; and, when allowed, the amounts of such bills might be paid upon the warrants of the Governor and Council. By § 2, the manager was required to make a report

to the Legislature annually of his doings, and of the earnings and expenses of said railroad and tunnel, with a detailed estimate of all sums to be required for the year next ensuing. The St. of 1880, *c.* 261, § 1, provided that the tolls fixed under the St. of 1875, *c.* 77, might be a proportionate part of the gross receipts of the railroad corporation using said railroad and tunnel; and § 3 authorized the manager, by direction of the Governor and Council, to make contracts with connecting railroads for the purpose of constituting through lines, and, in making such contracts, to agree to accept a *pro rata* of the through rates upon freight and passengers via such through lines.

Such was the state of the legislation at the time when the accident happened which is the subject of the present action; and the question to be determined is a question of the true construction of the statutes. It is urged, in behalf of the defendant, that the Commonwealth cannot be impleaded in its own courts, except by its own consent, clearly manifested by an act of the Legislature. But, without now considering how far this doctrine is applicable to its agents and servants, we are of the opinion that the Legislature intended to give its consent that the manager of its railroad might be sued in cases like the present. In undertaking the operation of the railroad, it is reasonable to think that the same responsibilities were intended to be assumed as ordinary railroad corporations are obliged to assume. The first section of the St. of 1875, *c.* 77, recognizes and declares this intention. The Legislature might well deem it a narrow policy for the State to undertake such management, without making adequate provision for meeting the ordinary responsibilities which are incident to this kind of business. Many of these are imposed by the common law on all common carriers of passengers and goods. Their expediency and wisdom have been recognized by the Legislature. The State, while holding all other and competing lines to a full measure of common law and statutory responsibility, might well hesitate to say to the public, "We invite your patronage for this line, but do not intend to furnish the same remedies, in case of loss or injury, as other lines are subject to." Such a course might well be thought, on the one hand, to take an unfair advantage of other railroads,

and, on the other hand, to injure its prospect of ultimate suc-
cess, and hinder or defeat the development of its business.    No
sanction is to be found in the statutes for such a view.    It is
nowhere provided that the rates of carriage, for passengers or
freight, shall be less, in consequence of the more limited respon-
sibility or less perfect remedies which will exist in case of loss.
On the contrary, there are special and numerous provisions look-
ing to a different result.    The road is to receive its full *pro rata*
proportion of through rates.    If it could be supposed that, on
merely business grounds, it was found expedient to put this road
on a different footing from ordinary railroads in respect to lia-
bility for losses or injuries, it is reasonable to think that full
and plain words to express that intention would be found in the
statutes.

It is urged upon our attention, that the manager has not the
power to expend money on works of construction until appro-
priations are made for the purpose, and then only under direc-
tion of the Governor and Council.    Conceding the point, what
follows?    Does it follow, if insufficient appropriations are made
to keep the road in proper order, and to erect suitable cattle-
guards and barriers, and if, by reason thereof, animals come
upon the track, or persons are run over, or trains are thrown
from the track, or losses or injuries of any kind occur, that there
is no responsibility on the part of any one therefor?    We think
not.    It is suggested that there may be an application to the
Legislature for relief.    But this is not a legal remedy.    Such
an application is not made under any provisions of law, and
its reception and the action to be taken upon it do not depend
upon any rules of law, but upon the judgment, wisdom or favor
of the Legislature itself.

We are also of the opinion that it was the intention of the
Legislature to give this remedy, in cases where it properly exists
at all, by an action brought against the manager who fills that
position at the time when the remedy is sought; and that it is
not limited to the particular manager through whose negligence
or default the cause of action arose.    Otherwise, a manager would
be liable to be sued long after his retirement from office, when
his official relations with the Commonwealth have ceased, and
when he has no longer any interest or duty in relation to the

defence of the action. It is not to be supposed that the Legislature would deem it expedient to entrust the interests of the Commonwealth to the care of a retired official, who might by possibility have been removed for cause, or have entered the service of a competing line or of an employer having an adverse interest.

A like result is reached from a consideration of the relations of the Commonwealth, as an owner of a railroad, towards the public whose patronage it invites. The manager is in the nature of a sole or quasi sole corporation. Otherwise the remedy provided for any party aggrieved would be very imperfect. The original construction, or repairs and improvements, may be begun by one manager and finished by another. An investigation may be needed to determine whether work, clearly insufficient or defective, was done under one manager or another. There might also be a concurring negligence of two or more successive managers. Work or safeguards, originally sufficient, may become insufficient, either through natural decay or wear, or through the increase of business or population. The State cannot itself be sued, and did not intend to allow an action to be brought directly against itself. Nevertheless, it was to engage in the business of operating a railroad, through an officer called the manager, whose office was designed to be permanent. One manager might die, resign or be removed. The individual might change; but the office was to be permanent. To the public, the manager was put forward as the representative of the authority which owns the railroad. A liability was imposed on him by statute. In form, this was at the outset personal. In substance and effect, it was official. And, since the passage of the St. of 1878, the liability of his person and property is taken away. He is merely left as the person to be named as defendant in the suit, and charged with the duty of defending it; but with no personal responsibility for the payment of the judgment, and indeed, since the passage of the St. of 1879, with no power even to retain the earnings of the railroad for the purpose of satisfying it.

The next question is whether it was competent for the plaintiff to introduce the testimony of an expert to show his opinion that a cattle-guard or barrier was necessary at a particular point.

Such testimony was incompetent. The question involved a consideration of the amount of travel on the highway, and other things, suitable to be judged of by the jury. *Milwaukee & St. Paul Railway* v. *Kellogg*, 94 U. S. 469. *Nowell* v. *Wright*, 3 Allen, 166. *Hill* v. *Portland & Rochester Railroad*, 55 Maine, 438.

The instruction of the judge, as to the statutory duty of maintaining a fence or barrier at the place where the plaintiff's horse entered upon the railroad, as modified, was in conformity to what the plaintiff now contends is the true construction of the statute; but the plaintiff insists that the jury were nevertheless misled by the instruction, as originally given.* Since a new trial must be granted on other grounds, it is unnecessary to consider this ground of exception.

The instruction that, "if the plaintiff's son was negligent in not keeping a firm hold on the halter, and this negligence was partly the cause of, and contributed to, the accident, the plaintiff cannot recover," was right, so far as it went. The plaintiff, however, urges upon us that the alleged negligence of his agent was too remote to be properly considered as contributing to the injury to his horse. But no instruction upon this aspect of the question appears to have been asked for. If, through the negligence of the plaintiff's agent, his horse got away, and ran, and was injured at the distance and place shown by the plan which was put in evidence, and if it was found by the jury that the injury was likely to happen as a natural and probable consequence of such negligence, so that the negligence might in their judgment fairly be considered to be a contributory cause of the injury, the plaintiff was not entitled to recover. It is not a case

---

* The judge, at the request of the defendant, instructed the jury as follows: "If the place where the horse entered on the railroad was a part of the yard and grounds used for shifting trains in connection with the Shelburne Falls station, or was within the highways or approaches entering upon or crossing said yard and grounds, the statute relating to fences and barriers does not apply." Upon objection being made by the plaintiff, the judge modified the instruction by instructing the jury that, if they found the place such as described, there was no statute which absolutely requires the erection of a fence or barrier there, but it was for them to determine whether the erection thereof was necessary and practicable.

where, on the facts reported,* the court can say, as matter of law, that the negligence was too remote. *McDonald* v. *Snelling*, 14 Allen, 290, 296. *Milwaukee & St. Paul Railway* v. *Kellogg*, 94 U. S. 474. Even on the doctrine of *Marble* v. *Worcester*, 4 Gray, 395, cited by the plaintiff, the negligence would not be too remote. In that case, a controlling consideration was, that the plaintiff was a stranger to all connection with the horse; and it was expressly said that the mere distance of place between the existence of the defect and the damage might not be sufficient to prevent a plaintiff from recovering.

*Exceptions sustained.*

---

* The exceptions stated that the horse, after escaping from his keeper, ran a distance of six hundred and fifty feet before entering upon land of the railroad, and then ran five hundred and seventy feet to the bridge on which he was injured.