# SUPPLEMENT.

## OPINION OF THE JUSTICES TO THE SENATE.

Spec. St. 1918, c. 159, providing in substance for the leasing to the Commonwealth of the road and property of the Boston Elevated Railway Company to be operated for a limited time by public officers upon the payment of a fair rent, is constitutional.

A statute changing Spec. St. 1918, c. 159, by providing for a maximum fare of five cents upon the lines of the Boston Elevated Railway Company, and by providing that, if the income thus received shall be inadequate to meet the cost of service, the deficiency shall be made up by payments from the treasury of the Commonwealth out of moneys to be borrowed, and that the sums so advanced shall be assessed upon the cities and towns using the service of the company, would be constitutional.

A statute changing Spec. St. 1918, c. 159, by providing for reducing the fares to be charged on the lines of the Boston Elevated Railway Company by the payment by the Commonwealth to that company of an amount equal to the rentals due from the company for the use of subways and for the ultimate assessment of the sums so paid by the Commonwealth upon the cities and towns using the service of the company, would be constitutional.

The General Court has the right to authorize the operation of the lines of the Boston Elevated Railway Company by the Commonwealth through trustees appointed by the Governor, because the transportation of the public thus provided for is a public purpose; and there is no constitutional requirement that the operation of the lines for such a purpose by the public authorities shall be at cost or at a profit.

A statute of the character described would be constitutional only after a legislative determination that the value of the private property thus devoted to a public use required such contribution from the Commonwealth in addition to all other sources of income in order that the owners of the property might receive a fair return. Such a legislative determination was made by Spec. St. 1918, c. 159, §§ 5, 6, in fixing the "dividends" to be paid upon the shares of the Boston Elevated Railway Company.

In making legislative provision for the apportionment of public burdens among different municipalities, although it has been the custom of the General Court usually to submit such legislation to the acceptance of the municipalities to whose taxes resort must be had for the money required, this has not always been done and it is not necessary under the Constitution.

THE following order was passed by the Senate on March 12, 1919, and on March 15, 1919, was transmitted to the Justices of the

Supreme Judicial Court. On April 2, 1919, the Justices returned the answer which is subjoined.

WHEREAS, there is now pending in the General Court a bill numbered Senate 54, entitled "An Act establishing a five cent fare on the lines of the Boston Elevated Railway Company and subsidizing the company from the public treasury for any resulting deficiency," a copy of which is herewith submitted; and

WHEREAS, said bill makes reference to chapter 159 of the Special Acts of the year 1918, and proceeds upon the assumption that said chapter 159 is constitutional and wholly operative, the stockholders of the Boston Elevated Railway Company and the West End Street Railway Company having duly accepted the provisions of said chapter 159, and all the conditions prescribed therein having been performed, which under its terms are necessary in order to render it fully effective; and

WHEREAS, there is also now pending in the General Court a bill numbered House 722, entitled "An Act to provide for the assumption of subway rentals by the communities served by the Boston Elevated Railway Company," a copy of which is herewith submitted, and which also refers to said chapter 159, and likewise proceeds upon the assumption that said chapter 159 is constitutional and wholly operative; and

WHEREAS, there are other bills pending before the General Court, — to wit: — Senate bills numbered 52 and 287, and House bills numbered 721, 1351 and 1352, — copies of which are hereto annexed, which cannot be intelligently acted upon unless the General Court is authoritatively advised relative to the constitutionality of said chapter 159; therefore be it

ORDERED, That the Senate require the opinions of the Honorable the Justices of the Supreme Judicial Court upon the following important questions of law:

(1) Would said Senate Bill No. 54 be constitutional if enacted?

(2) Would said House Bill No. 722 be constitutional if enacted?

(3) Is the whole or any part of said chapter 159 unconstitutional?

(4) Is any part, or are any parts, of said chapter 159 which have a direct relation to the validity of said Senate Bill No. 54 or said House Bill No. 722, unconstitutional?

Senate Bill No. 54, referred to above, was as follows:

An Act establishing a Five Cent Fare on the lines of the Boston Elevated Railway Company and subsidizing the Company from the Public Treasury for any Resulting Deficiency.

Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, as follows:

SECTION 1. The rate of fare for each single passage over the lines of the Boston Elevated Railway Company that may be fixed by the board of trustees of said company, acting under chapter one hundred and fifty-nine of the Special Acts of nineteen hundred and eighteen, shall not exceed the sum of five cents, and the distance that may be travelled for the sum of five cents shall in no case be less than as established on the day nineteen hundred and eighteen.

SECTION 2. If the rate of fare chargeable under the provisions of section one is inadequate to meet the cost of the service, less all the items to be deducted as provided in section six of said chapter one hundred and fifty-nine, including dividends as therein specified, the reserve fund established under section five of said chapter one hundred and fifty-nine, shall be used to make up the deficiency as provided in section nine of said chapter one hundred and fifty-nine.

SECTION 3. If at any time said reserved fund be less than seventy per cent of its amount as originally established, the trustees shall thereupon give notice to the Treasurer and Receiver General, and the Commonwealth shall thereupon pay over to the company such amount as may be necessary to restore said fund to an amount equal to said seventy per cent. In order to meet any payment required under this section, the Treasurer and Receiver General may borrow at any time, in anticipation of the assessments to be levied upon the cities and towns, as provided in the following section, such sums of money as may be necessary to make said payment.

SECTION 4. All sums advanced to the company under the provisions of the preceding section shall be assessed upon the cities and towns in which the company operates in the manner provided by section fourteen of said chapter one hundred and fifty-nine.

SECTION 5. So much of said chapter one hundred and fifty-nine as is inconsistent herewith is hereby repealed.

SECTION 6. This act shall not take effect unless it is accepted by the holders of not less than a majority of all the stock of the Boston Elevated Railway Company, not including the preferred stock issued under section five of said chapter one hundred and fifty-nine, and by the holders of not less than a majority of all the stock of the West End Street Railway Company, given at meetings called for the purpose, and the filing with the secretary of a certificate to that effect signed by a majority of the directors of the Boston Elevated Railway Company.

House Bill No. 722, referred to above, was as follows:

An Act to provide for the Assumption of Subway Rentals by the Communities served by the Boston Elevated Railway Company.

Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, as follows:

In order to decrease the rates of fares which would otherwise be necessary to meet the cost of service upon the Boston Elevated Railway, the board of trustees of the Boston Elevated Railway Company are hereby directed quarterly on the first of January, April, July and October to certify to the Treasurer and Receiver General the amount paid during the preceding quarter for rentals of subways or other property owned by the Commonwealth, or any city, town, or other subdivision thereof and leased to said company, and the Commonwealth shall thereupon pay over to the company the amount so certified. In order to meet said payments the Treasurer and Receiver General shall borrow any sums necessary therefor, and thereafter repay the same, and any sums so paid to the company together with interest or other charges incurred in borrowing money therefor shall be assessed upon the cities and towns in which the company is operated, in the manner provided by chapter one hundred and fifty-nine of the Special Acts of the year nineteen hundred and eighteen with reference to deficiencies in the reserve fund thereby established.

To the Honorable Senate of the Commonwealth of Massachusetts:

We, the Justices of the Supreme Judicial Court, have considered the questions upon which our opinion is required by the order

of March 12, 1919, a copy of which is hereto annexed, and respectfully submit this opinion:

The questions relate primarily to the constitutionality, if enacted, of Senate Bill No. 54 and House Bill No. 722. These bills in form and substance are amendments to Spec. St. 1918, c. 159. Nevertheless the proposed changes are so radical as to make them in substance important new legislation and not mere perfecting of the details of an existing statute. In order to express an intelligent opinion upon the proposed bills, it is necessary to examine the original statute. We are constrained to do this under these circumstances notwithstanding the well settled rule, from which we do not here depart, that we are not required to express to the General Court or either branch thereof opinions as to the constitutionality or construction of statutes already enacted. *Commonwealth* v. *Smith,* 9 Mass. 531. *Opinion of the Justices,* 226 Mass. 607, and references at page 612.

We consider first Spec. St. 1918, c. 159. That act was in substance and effect a taking over of the Boston Elevated Railway by the Commonwealth for operation for a limited period of ten years and possibly for a longer period under some circumstances, upon condition that its terms should be accepted by the holders of not less than a majority of all the stock of the Boston Elevated Railway Company and of the West End Street Railway Company and upon the further condition that the Boston Elevated Railway Company should provide for raising $3,000,000 by the issuance of that amount of new and preferred stock. Two main purposes of that act were (1) to provide for the establishment of rates of fares which should be adequate to pay the cost of performing the service furnished by the Commonwealth through using the property of the Boston Elevated Railway Company as that cost was defined in § 6, and (2) to make an agreement for the payment of the rental for the use of the Boston Elevated Railway Company and its property by the Commonwealth by agreement with the companies interested to be manifested by acceptance by their stockholders. That rental was fixed by §§ 5 and 6 at payment not exceeding seven per cent on the preferred stock and by payment of dividends on the common stock of five per cent for the first two years, five and one half per cent for the succeeding two years, and six per cent for the remainder of the period of public operation. The chief

design of that act was to provide by public operation for fares at rates sufficient to meet all costs of furnishing the service.

In § 11 provision was made for the advancement of moneys by the Commonwealth (to be assessed upon the cities and towns enjoying the service) to maintain the reserve fund. But that was rather an incidental provision to tide over the affairs of the company until the fundamental idea of rates adequate to meet the cost of the service could be established and the habits of the travelling public could become adjusted thereto. That act was accepted by the stockholders of the two corporations and the new stock has been subscribed. Thus the act has become operative according to its terms and constitutes a contract between the parties as set forth in § 18.

We are of opinion that that act was constitutional and for these reasons: The means of transportation for people at large is a matter of public interest. In earlier times turnpikes and toll bridges in private ownership and management afforded facilities for travel. Gradually these mostly have been taken over by counties, cities and towns and the tolls abolished. *Andover & Medford Turnpike Corp.* v. *County Commissioners,* 18 Pick. 486. *Murray* v. *County Commissioners,* 12 Met. 455. *Central Bridge Corp.* v. *Lowell,* 4 Gray, 474; *S. C.* 15 Gray, 106. The ownership and operation of a ferry by a municipality contravenes no constitutional limitation. *Attorney General* v. *Boston,* 123 Mass. 460. Steam railroads in their last analysis are highways for the use of the public. The Commonwealth has in several instances lent its aid to the construction of such railroads. *See Kingman, petitioner,* 153 Mass. 566, 570, for references to statutes. Numerous special statutes and finally a general law have been enacted authorizing cities and towns to subscribe for stock of railroads. *Kittredge* v. *North Brookfield,* 138 Mass. 286. *Commonwealth* v. *Williamstown,* 156 Mass. 70. Such legislation is constitutional. *Prince* v. *Crocker,* 166 Mass. 347, 361. The Commonwealth contributed toward the construction of the Hoosac Tunnel and ultimately acquired the ownership and assumed the management of the Troy and Greenfield Railroad. *Troy & Greenfield Railroad* v. *Commonwealth,* 127 Mass. 43. *Amstein* v. *Gardner,* 134 Mass. 4. Nearly forty early statutes incorporating street railways contained a section whereby the municipality within which such railway was

constructed might acquire its property. The construction of the Boston subway for street railway purposes was held a public use for which money raised by taxation lawfully might be expended. *Prince* v. *Crocker*, 166 Mass. 347. The same is true of the East Boston Tunnel. *Browne* v. *Turner*, 176 Mass. 9. Property invested in street railways by private investors has been held to become thereby affected with a public interest. *Donham* v. *Public Service Commission*, 232 Mass. 309. It has been decided in other jurisdictions that the construction, acquisition and operation of street railways may be made a municipal function. *Sun Printing & Publishing Association* v. *Mayor of New York*, 152 N. Y. 257. *Walker* v. *Cincinnati*, 21 Ohio St. 14. *Platt* v. *San Francisco*, 158 Cal. 74, 81, 82. *Barsaloux* v. *Chicago*, 245 Ill. 598. Under modern conditions local transportation by an electric railway may be determined by the Legislature to concern the welfare and convenience of all the inhabitants of a particular district. In essence Spec. St. 1918, c. 159, was a legislative agreement for the lease to the Commonwealth of a public utility to be operated for a limited time by public officers upon the payment of fair rental on an investment made under public supervision and under laws prohibiting stock watering or other means of inflation.

We are led to the conclusion that said c. 159 was within the constitutional power of the Legislature.

A radical change in the scheme embodied in Spec. St. 1918, c. 159, is proposed by Senate Bill No. 54 and House Bill No. 722. Rates of fare large enough to pay the cost of the service are abolished and a fare, which is or may be less than cost, is substituted, the balance of the cost to be made up by taxation. Senate Bill No. 54 provides in substance for a maximum fare of five cents upon the lines of the Boston Elevated Railway Company, and, if the income thus received shall be inadequate to meet the cost of the service, as apparently confessedly it will be, the deficiency is to be made up by payments to the Boston Elevated Railway Company from the treasury of the Commonwealth out of moneys to be borrowed. Sums so advanced are to be assessed upon the cities and towns in which the lines of the company are operated in proportion to the number of persons therein using the railway company. Thus the money paid to the Boston Elevated Railway Company is ultimately to be raised by taxation. In form and substance

Senate Bill No. 54 is an amendment of Spec. St. 1918, c. 159. The proposed bill amends that act in effect by striking out § 7, which requires fares as nearly as possible to meet the cost of service, and by substituting therefor its § 1, which establishes a maximum fare of five cents, and by modifying by its §§ 2, 3, 4 and 5, the terms of §§ 9, 10, 11 and 14 of said c. 159. House Bill No. 722 aims at the result of reducing the fares to be charged on lines of the Boston Elevated Railway Company by the payment by the Commonwealth to that company of an amount equal to the rentals due from it for the use of subways and the ultimate assessment of the sums so paid upon the same cities and towns in the same way as in Senate Bill No. 54. This also is a raising by taxation of money for the operation of the Boston Elevated Railway Company. Thus the conception of rates of fare adequate to meet the cost of the service is wholly eliminated and for that plan a fixed maximum rate of fare, which is or may be much less than the cost of service, is put in its place, the difference between the actual cost of the service and the fixed maximum rate to be made up out of moneys to be raised by taxation. The method adopted is to continue the payment of the dividends to the stockholders of the Boston Elevated Railway Company fixed by said c. 159 and treat these dividends as a part of the cost of the service. The proposed legislation provides also that it shall become operative with its burdens of increased taxation in the various cities and towns to be affected without submission to their voters or municipal boards or officers for acceptance.

It is a matter of common knowledge that the expenses of maintenance and operation of street railways in the neighborhood of Boston have increased enormously since the outbreak of the great war. This is due among other causes to the greatly augmented costs of labor, copper, coal and necessary supplies. The adjustment of fares to meet these changed conditions without unusual public inconvenience and interference with settled social conditions of a considerable portion of the people presents a problem of great difficulty. The present appears to be commonly regarded as a period of transition, where prophecy as to the ultimate adjustments to be reached is uncertain.

The fundamental question thus presented is whether the State has the power under the Constitution to take over a public utility

such as is the Boston Elevated Railway Company and operate it for so low a rate of fare as to create a deficit and pay that deficit in the only way in which it can be paid, out of moneys raised by taxation. To state the question differently, it is whether the State can carry such persons as desire to ride upon the Boston Elevated Railway at less than cost and assess the rest of that cost upon the public by taxation. This is an entirely novel question so far as we are aware. No decision has been made of such a question to our knowledge. Reference was made to the general principle in *Opinion of the Justices*, 150 Mass. 592, 593, in these words: "We also assume that the gas or electricity to be furnished to the inhabitants for their private use is to be paid for by them at rates to be established, which shall be deemed sufficient to reimburse to the cities and towns the reasonable cost of what is furnished, and that all the inhabitants of a city or town are to have the same or similar rights to be supplied with gas or electricity, so far as is reasonably practicable, and the capacity and extent of the works, which it is deemed expedient to maintain, will permit. Whether cities and towns can be authorized to give gas or electricity to their inhabitants, or to sell either to them, at varying and disproportionate prices, selecting their customers, selling to some and arbitrarily refusing to sell to others, are questions which it is not necessary to consider." It also was said in *Attorney General* v. *Boston*, 123 Mass. 460, at pages 469, 470, that it was not necessary to consider "whether it is within the power of the Legislature, under the Constitution of the Commonwealth, to authorize a city or town to establish and maintain a free ferry at the public expense." It was said in *Davies* v. *Boston*, 190 Mass. 194, 197, respecting the same ferry, "The fact that the business, as managed, was not profitable to the city does not change its character."

It is an underlying principle of our government that money raised by taxation can be used only for public purposes and not for the advantage of private individuals. "The power to levy taxes is founded on the right, duty and responsibility to maintain and administer all the governmental functions of the State, and to provide for the public welfare. To justify any exercise of the power requires that the expenditure which it is intended to meet shall be for some public service, or some object which concerns

the public welfare. The promotion of the interests of individuals, either in respect of property or business, although it may result incidentally in the advancement of the public welfare, is, in its essential character, a private and not a public object." *Lowell* v. *Boston*, 111 Mass. 454, 460, 461.

There are numerous instances where the State has authorized the construction and maintenance of public works which involve the element of benefit to private individuals. Assessments of benefits are authorized but seldom are required to equal in amount the benefit conferred. It is limited sometimes to one half only. See as to highways, R. L. c. 50, § 1, now St. 1917, c. 344, Part III, § 1. There is no such limitation as to the assessment of benefits arising from sewers. R. L. c. 49, § 3. Annual assessments for the use of sewers to aid in their maintenance have been authorized. Some statutes authorize assessments for reconstruction of sidewalks. All these statutes have been upheld. *Carson* v. *Brockton*, 175 Mass. 242, and 182 U. S. 398. *Sayles* v. *Public Works of Pittsfield*, 222 Mass. 93. Statutes authorizing building of a markethouse, *Spaulding* v. *Lowell*, 23 Pick. 71, the removal of ashes, *Haley* v. *Boston*, 191 Mass. 291, and the maintenance of public baths, *Bolster* v. *Lawrence*, 225 Mass. 387, part of the expense to be charged to those benefited, have been upheld. In no instance, so far as we are aware, has it been intimated that the entire expense must be borne by those benefited or that the entire benefit must be assessed. The taking over of toll bridges and roads and the abolition of tolls have already been referred to.

The fundamental question is whether the General Court has the right to authorize the operation of the Boston Elevated Railway Company through trustees appointed by the Governor. It can do so if it is a public purpose. If it is a public purpose, the General Court has the same power respecting that purpose that it has respecting other public purposes. Since transportation of the public such as is furnished by the Boston Elevated Railway is a public purpose, there is no imperative constitutional requirement that it must be operated by the public authorities at cost or at a profit.

The present bills provide in their ultimate analysis for taxation in order that dividends may be paid to the stockholders of a public service corporation. Property invested by private persons in

public service corporations becomes affected with a public interest. Statutes authorizing rate regulation of privately owned public utilities rest on this principle. It commonly has been held that stockholders of such corporations who have wisely and honestly invested property actually used for the benefit of the public are entitled to a reasonable return upon their investment. We are unable to discern any distinction in principle between public operation at a loss to be made up by general taxation of a utility owned by the public and a contribution from public money toward the efficient maintenance of the same utility in private ownership but under public operation. A statute to such an end would be constitutional, however, only after a legislative determination that the real value of the private property so devoted to the public use, together with all its other sources of income, required such contribution in order that it might receive fair return. Legislation designed merely to provide a gratuity to private individuals, corporations or stockholders, would of course be unconstitutional. Such a determination was made in essence by the enactment of said c. 159. That act in §§ 5 and 6 substantially determined that the dividends there set forth constituted a fair return on actual investment.

Therefore, we are of opinion that the public as a body has a concern in the continued operation of the Boston Elevated Railway, by the trustees appointed by the Governor, in a safe and practical manner adequate to the needs of those who travel. If the rational way to accomplish this result is an assumption by the public of a part of the expense so that the burden of operation shall not fall alone upon the shareholders but also in part upon the cities and towns using the service in the way provided in the proposed bills, that is a public purpose. It was an inducement to stockholders to continue an otherwise losing and possibly confiscatory investment.

The right to apportion the public burdens among different, separate divisions of the State can hardly be questioned. *Hingham & Quincy Bridge & Turnpike Corp.* v. *County of Norfolk*, 6 Allen, 353. Although it has been the custom of the General Court to submit such legislation to the acceptance of the municipalities to whose taxes resort must be had for the money required, that has not always been done nor is it necessary under the Con-

stitution. The power of the Legislature is paramount in this particular. *Kingman, petitioner*, 153 Mass. 566.

The questions presented reach into a new field differing fundamentally from any hitherto occupied by legislation. We have given them the best consideration possible in the time at our disposal.

Therefore we answer "Yes" to questions (1) and (2) and "No" to questions (3) and (4).

> ARTHUR P. RUGG.
> WILLIAM CALEB LORING.
> HENRY K. BRALEY.
> CHARLES A. DE COURCY.
> JOHN C. CROSBY.
> EDWARD P. PIERCE.
> JAMES B. CARROLL.