Boston Elevated Railway Company, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 76751, 77244. Promulgated March 22, 1938.

*Charles W. Mulcahy, Esq.,* and *Ward Loveless, Esq.,* for the petitioner.

*Bruce A. Low, Esq., Warren W. Cole, Esq.,* and *L. H. Rushbrook, Esq.,* for the respondent.

502

**OPINION.**

VAN FOSSAN: The first and controlling issue is whether, under the above facts, petitioner should, as contended by it, return its income

in the normal way, usual to corporations, by listing all items of gross income and deducting therefrom the deductions allowed by statute, paying tax on the net income so determined, or should, as contended by respondent, return as gross income the amount of the dividends paid to its stockholders, plus the Federal tax thereon and minus certain deductions, paying tax on the net of such computation, as provided in article 70 of Regulations 74[1] and Regulations 77, entitled "Income to lessor corporation from leased property."

The basic predicate of article 70 of Regulations 74 and Regulations 77 is "*where a corporation has leased its property* in consideration that the lessee shall pay in lieu of other rental an amount equivalent to a certain rate of dividend on the lessor's capital stock * * * such payments shall be considered rental payments and shall be returned by the lessor corporation as income", etc. Here the Commissioner ruled that "the taking over of the properties of the Boston Elevated Railway Company was, *in effect*, a direct lease of these properties and assets to the Commonwealth of Massachusetts in consideration for the payment of a fixed annual rental * * * in the form of dividends on the capital stock * * *." Obviously petitioner had not leased its property to the commonwealth in the ordinary sense of that term. Was the Commissioner correct in holding that the relationship, "in effect", was that of lease?

The commonwealth, through its legislative body, established an elaborate system whereby the railway properties of petitioner were to be kept in operation for the benefit of the public. The Public Control Act, designed to carry out the plan, provided for the appointment of a board of trustees to assume that duty and take charge of petitioner's property. Their function was to "manage and operate" the petitioner's railway and other properties. The petitioner consented to the plan.

The board was given the broad and unusual powers to regulate and fix rates and also to cooperate with the treasurer and receiver-

---

[1] ART. 70. *Income to lessor corporation from leased property.*—Where a corporation has leased its property in consideration that the lessee shall pay in lieu of other rental an amount equivalent to a certain rate of dividend on the lessor's capital stock or the interest on the lessor's outstanding indebtedness, together with taxes, insurance, or other fixed charges, such payments shall be considered rental payments and shall be returned by the lessor corporation as income, notwithstanding the fact that the dividends and interest are paid by the lessee directly to the shareholders and bondholders of the lessor. The fact that a corporation has conveyed or let its property and has parted with its management and control, or has ceased to engage in the business for which it was originally organized, will not relieve it from liability to the tax. While the payments made by the lessee directly to the bondholders or shareholders of the lessor are rentals as to both the lessee and lessor (rentals paid in one case and rentals received in the other), to the bondholders and the shareholders such amounts are interest and dividend payments received as from the lessor and as such shall be accounted for in their returns. [Article 70 of Regulations 77 is identical.]

general of the commonwealth in equalizing the cost of service with operating receipts, by means of assessments against the cities and towns served by the company's lines. Thus, it acted in a dual capacity—as a manager and as a rate-fixing board. But it is in relation to the former capacity that questions of income must be decided.

In so far as the taxable income received by petitioner is concerned, the board of trustees acted in the capacity of a managing agent. The board conducted the petitioner's affairs just as a corporation, individual, or any other entity designated for that purpose might have done. In this respect it served as a substitute to carry on the functions normally performed by the petitioner itself.

In section 2 of the Public Control Act the status of the board of trustees was specifically set forth. The trustees and their agents and employees were "deemed to be acting as the agents of the company and not of the Commonwealth." In its acts involved in the operation of the railway system and hence in the production of income, the board thus was designated as the agent of the petitioner. The issue is not confused nor is it controlled by the fact that the trustees also represented the people of the commonwealth and that in one sense the properties were operated by the commonwealth. See *Helvering* v. *Powers*, 293 U. S. 214. The consideration of their undertaking and managing of the petitioner's affairs was the continuation of the operation of the railway as a public utility for the benefit of the citizens who were dependent on its lines for transportation, but, by the express terms of the act creating the board of trustees and defining their duties and powers, the corporate entity of the petitioner was preserved. The property remained in private ownership. *Helvering* v. *Powers, supra.* All business transactions were carried on in the name of the corporation, including making contracts, paying bills, receiving and banking operating revenues, and all other acts normal to the conduct of its business. By specific provision of the act the compensation of the trustees was paid by the company.

In various cases, the Public Control Act has been construed by different courts on points directly related to the issue before us. In *Boston Elevated Railway Co.* v. *Malley*, 24 Fed. (2d) 758, the petitioner asked for a refund of capital stock tax on the ground that under the leased road theory it was not taxable. There, the court (in 1928) said:

The rather complicated arrangement under which the public took over the management and operation of the Boston Elevated Railway Company under Sp. Acts 1918, c. 159, has been fully and authoritatively described (see Opinion of the Justices to the Senate, 231 Mass. 607, 122 N. E. 763; *Boston* v. *Treasurer of the Commonwealth*, 237 Mass. 403, 130 N. E. 390; Id., 260 U. S. 309, 43 S. Ct. 129, 67 L. Ed. 274; Opinion of the Attorneys General of Massachusetts 1919,

p. 20; Opinions of the Justices to the Legislature (Mass.) 159 N. E. 55, 70, November 22, 1927; *Boston Elevated Railway* v. *Malley*, (D. C. 288 F. 864); and it is not necessary to restate it here. The gist of it is that the company, in return for payments and guaranties by the commonwealth, abdicated its right to manage its property and affairs in favor of public trustees appointed by the Governor. The business was still conducted in the name of the company, and all contracts for labor and supplies relating to the operation of its railway were made in its name. It continued to be liable in contract and in tort, as it had previously been. The special act expressly provided that the trustees "shall be deemed to be acting as agents of the company and not of the commonwealth."

The basic facts leave but slight ground for the plaintiff's contention. An elaborate and ingenious argument has been made on its behalf based largely upon the use of the words "lease" and "take over" by the Supreme Judicial Court in describing the relations between the company and the commonwealth. 231 Mass. 607, 609, 122 N. E. 763. See, too, Opinion of the Justices of November 22, 1927 (Mass.) 159 N. E. 55. With respect to this terminology, Judge Peters observed: "It is not profitable to discuss whether the term 'lease' is properly descriptive of the legislative contract." *Boston Elevated Railway* v. *Malley* (D. C.) 288 F. 864, 870. It is the essential character of the arrangement as gathered from the special act and the opinions and decisions above cited, rather than the expressions used to describe it, upon which the present question turns. * * *

In *Boston Elevated Railway Co.* v. *White* (not reported), the precise issue here presented was decided in favor of the petitioner by the United States District Court for the District of Massachusetts and no appeal was taken from that decision. In that case the petitioner sued for a refund of Federal income tax paid for the year 1930 on the leased road basis. There, the court (in 1934) said:

The defendant contends that the relation between the plaintiff and the Public Trustees of the Boston Elevated Railway Company was in effect that of lessor and lessee for the purpose of the Federal income tax. Assuming, for the purposes of this case, but by no means deciding that this is so, the tax was not legally collectable.

The Treasury Regulation providing that where a corporation leases its property in consideration that the lessee shall pay in lieu of other rental an amount equivalent to a certain rate of dividend on the lessor's capital stock, such payments shall be considered rental payments and shall be returned by the lessor corporation as income, notwithstanding the fact that the dividends are paid by the lessee directly to the stockholders of the lessor, is not applicable. The dividends received by the stockholders in the case at bar were in no sense received from the Public Trustees or from the Commonwealth. The amount of such dividends paid by the plaintiff cannot be regarded as income received by it.

We are of the opinion that respondent was in error in his holding that the taking over of these properties "was, in effect, a direct lease of these properties" to the Commonwealth.

It may be added that nothing has come to our attention that leads us to believe that the employment of the fiction that the relationship

between the petitioner and the commonwealth was that of lessor and lessee would more accurately reflect petitioner's income. In this respect the instant case bears some resemblance to *Cleveland Railway Co.*, 10 B. T. A. 310; affirmed in part, 36 Fed. (2d) 347, albeit in that case the position of the parties and their respective contentions were exactly reversed.

In the *Cleveland Railway Co.* case, consequent on financial difficulties experienced by the railway system, a plan of operation known as the "Taylor plan" was adopted, under which transportation was to be furnished at cost of service. This cost of service included "operating and maintenance costs fixed by the City of Cleveland on a car-mile basis, interest on bonded and floating indebtedness and a return to the stockholders of 6 per cent on the outstanding capital stock. In fixing a return of 6 per cent it was provided that this would be paid in quarterly amounts and would not be dependent upon the earnings of the petitioner, but regardless of the amount earned, the return to the stockholders could not exceed 6 per cent." A fund of $500,000 known as the "interest fund" was established by the company, into which all earnings in excess of certain stated expenses were to go, and out of which certain payments were to be made, the fund being calculated to serve as a barometer to determine when and how the rate of fare was to be changed.

For several years the Cleveland Co. filed returns in the form and manner normal to corporations but in the taxable years returned as its net income the amount of money paid as the 6 percent return to its stockholders plus the certain taxes of the previous year. The Commissioner treated the gross amount received from car riders, less the usual statutory deductions, as the taxable income of the company and determined deficiencies accordingly. At the hearing the Commissioner contended that the taxpayer's net income should be determined in the ordinary way, namely, by treating as receipts all gross income and deducting therefrom those deductions allowed by statute, and that the remainder should be taxed as income, irrespective of whether the net income so determined exceeded or was less than the 6 percent permitted and guaranteed to its stockholders.

Discussing petitioner's contention that the net income of a given year may not reflect the exact status of the taxpayer, the Board held that "when viewed in the light of the statute * * * the petitioner's position is untenable." We said further, the fact "that the petitioner would not object to being taxed on more income than is earned in the 'lean years' does not make taxable income that which is not taxable income under the statute." Specifically, we held "that the contentions of the petitioner for a limitation of its taxable income to a 6 per cent return on its outstanding capital stock, without regard to the income earned, as defined by statute, must be denied."

In the case at bar the parties are in exactly the opposite positions. The taxpayer is contending for the right to return its income in the normal manner. The Commissioner is urging the unusual. Under the facts here present, we believe petitioner is right.

The second issue presents the question whether the payment of $1,775,338.80 made to the petitioner by the commonwealth in 1932 was an advance or loan or was a part of the petitioner's gross income.

The Public Control Act provided that a reserve fund of $1,000,000 should be set up for the purpose of making good any deficiency in the petitioner's income and, conversely, if its income were more than sufficient to meet the cost of service, the excess should be added to the reserve fund. The act as amended also provided that if the reserve fund was insufficient to meet any deficiency the commonwealth would pay over to the company the necessary amount to meet it. On June 30, 1932, the cost of service exceeded the petitioner's income by $1,775,338.80. The reserve fund had been exhausted and on July 15, 1932, the commonwealth paid that amount to the petitioner. The petitioner contends that the amount so paid was an advance or loan to it which it was required to repay under section 11, which reads as follows:

If as of the last day of any June thereafter during the period of public operation the reserve fund shall exceed the amount originally established, the trustees shall apply the excess so far as necessary to reimbursing the commonwealth for any amounts which it may have paid to the company under the provisions hereof.

The respondent maintains that the sum so paid is properly includible in the petitioner's gross income.

The petitioner's books reflect its position that the payment by the commonwealth was an advance or loan and that payments to the commonwealth were designated and treated as "repayments."

The petitioner relies on the principle set forth in *Island Petroleum Co.* v. *Commissioner*, 57 Fed. (2d) 992; certiorari denied, 287 U. S. 646; affirming 17 B. T. A. 1. In that case the petitioner paid to several corporations certain amounts which were to be repaid from the proceeds of the operation of those companies and which the petitioner would lose only if the operation were ultimately unsuccessful. Such payments were held to be loans. The court there said:

In the event of success it was to receive back the amount it had advanced plus its portion of the net profits. The advances were, therefore, loans which the Texas corporations would repay if successful. If they were unsuccessful, they would have nothing to pay with and the loss would fall upon petitioner.

It is immaterial that there was no express agreement on the part of the Texas corporations to repay the moneys advanced. Not only was such agreement implied in the agreement that only the net profits of the various enterprises were to be divided among the stockholders, but a promise to repay moneys laid out

and expended for the use and benefit of another and at his request is implied in law. * * * Here the expenditures were made for the use and benefit of the Texas corporations and upon an agreement made in their behalf. And it makes no difference in the result, if we construe the agreement as requiring repayment by the Texas corporations only in the event that their operations should prove successful. A loan is no less a loan because its repayment is made contingent.

It is well settled that when a taxpayer makes expenditures under an agreement that he will be reimbursed therefor, such expenditures are in the nature of advancements and are not deductible as business expenses. *Glendinning, McLeish & Co.*, 24 B. T. A. 518; affd., 61 Fed. (2d) 950; *Henry F. Cochrane*, 23 B. T. A. 202; *George M. Cohan*, 11 B. T. A. 743; *George F. Baker, Jr., Executor*, 28 B. T. A. 704; affd., 80 Fed. (2d) 813. By parity of reasoning payments so conditioned would not be income to the recipient.

The terms employed by the statute characterize definitely the nature of the payment and repayments to and from the commonwealth and the petitioner. When the reserve fund exceeds the $1,000,000 originally established, the excess shall be applied to "reimburse" the commonwealth, (sec. 11, Public Control Act) and the special trust fund remaining after the retirement of the second preferred stock shall be used to "repay" to the commonwealth all amounts previously assessed but not "repaid" under the Public Control Act (sec. 23, Acts 1921).

It is thus apparent that by the very language of the acts which form the agreement between the petitioner and the commonwealth both parties thereto understood and agreed that the payments back and forth through the reserve fund were advances and repayments as the profitable or unprofitable operation of the railway dictated. The sum of $1,775,338.80, therefore, was not income taxable to the petitioner in 1932.

The cases cited by the respondent involve no obligation of repayment and, therefore, are not in point.

The determination of the second issue automatically disposes of the third issue. No deduction of the item of $1,409,253.35 is allowable.

The fourth issue relates to the deductibility of an item paid by the petitioner to its preferred stockholders. The sum of $156,206.11 was paid as interest on the amounts due to stockholders in payment for their preferred stock, from July 1, 1931, the effective date of the act, to August 18, 1931, the date fixed by the trustees for the surrender and cancellation of the stock under section 9 of chapter 333, Acts 1931.

That section states unequivocally that after the effective date of the act "dividends upon all classes of preferred stock of the company shall cease." The act, in effect, changed the status of preferred stock-

holders on July 1, 1931, from shareholders in the petitioner corporation to creditors of it. After that date they had the right only to surrender their stock and to receive therefor various amounts fixed by the statute, together with *dividends* on their stock to July 1, 1931. The trustees were given a reasonable time in which to redeem the stock certificates and pay the debt so created by the act.

In obvious recognition of the character of the payments so to be made, the act makes a sharp and clear distinction between the stock prior to July 1, 1931, and the right of the stockholders to payment therefor, by providing that "*interest* at the rate of 5 per cent per annum from the date dividends cease" shall be paid to the petitioner's *former* stockholders. It imposed upon the petitioner the definite corporate liability to pay a fixed rate of interest on such principal indebtedness remaining unpaid after that date. The conclusion is inescapable that the $156,206.11 paid as interest thereon is an allowable deduction for the year 1931.

A brief resume of the facts relating to the establishment and treatment of the special trust fund is necessary for a clear understanding of the question raised by the fifth issue.

Under the provisions of chapter 740, Statutes 1911, the petitioner and West End were consolidated, to take effect June 10, 1922. The form of the acquisition of the West End assets by the petitioner was deemed a purchase and sale. The petitioner purchased the property, privileges, and franchises of West End in exchange for its own capital stock equal at par to the par value of the outstanding West End stock. West End thereupon distributed the petitioner's stock so received to its stockholders in accordance with their ownership of common and preferred stock.

In addition, the petitioner purchased the real estate of West End, not required in the railway business, for slightly over $1,500,000. The act required that the proceeds of the sale not to exceed $1,500,000 should be set aside by petitioner as a special trust fund the income of which should be used to retire the petitioner's second preferred stock issued to West End and distributed by it to its stockholders. The special trust fund was established to insure the redemption and retirement of such stock and after that should be accomplished (or its conversion into common stock, an alternative offered by the statute) the petitioner could use the fund and its accumulations for any purpose for which its stocks and bonds could legally be used. The act further provided that on June 10, 1922, the petitioner should assume all of West End liabilities and indebtedness and succeed to all of its rights.

Pursuant to the act, the nonbusiness real estate was purchased for $1,500,000 cash and the special trust fund was set up on July 18,

1913. The fund was held by the petitioner as trustee until June 10, 1922, when, with accumulations from income amounting to $707,342.17, it was taken over as property of the petitioner under the terms of the statute. Appropriate entries reflecting such acts were made on the petitioner's books.

Chapter 333, Acts 1931, changed the method of retirement of petitioner's second preferred stock held by former West End stockholders by authorizing the issuance of bonds, not exceeding $30,000,000 in amount, to cover the retirement of *all* existing preferred stocks of the petitioner. The only effect of this act in this respect was to release the special trust fund from the prior restriction and limitation of its use to the retirement of the second preferred stock.

Chapter 333 also voided, for the year 1931 only, the use of the reserve fund and payments from and to the commonwealth as established pursuant to sections 5, 8, and 9 of the Public Control Act. It likewise compelled the petitioner to repay to the commonwealth from the special trust fund the amount of $1,409,253.35 previously advanced by the commonwealth (secs. 22 and 23).

After the payment of the $1,409,253.35 on August 19, 1931, there remained in the special trust fund $823,753.95, which the respondent contends thereupon became income to the petitioner. That balance was divided and reassigned to the petitioner's other accounts to which the items properly related. Of the balance of $823,753.95 but $83,844.59 represented profit earned in the taxable year, which amount, it was stipulated, has already been considered in computing the petitioner's income on the "operating road" basis. In so far as the remainder of the fund represented accumulated profits of the fund they were earned in years prior to the taxable year, and accordingly should not be included in income for the taxable year. Earnings become income when they are received, not when they are distributed. *Cleveland Railway Co.* v. *Commissioner*, 36 Fed. (2d) 347. The removal of the restriction on the use of the fund in 1931 did not have the effect of converting accumulated profits from prior years, on which presumptively the tax had been paid, into income of the taxable year. Except as to the $83,844.59 earned in the taxable year, the fund represented a capital asset of petitioner. The sum of $83,844.59 representing profit derived from the use of the fund in 1931 was a proper item of income and has been so treated.

In the last issue respondent avers affirmatively that, in the event the Board determines that petitioner should report its income on the normal corporate basis as an operating company, such income should be returned on the basis of a fiscal year ended June 30 of each year. On this issue respondent has the burden of proof.

We find no evidence that leads us to conclude that petitioner's income will not be accurately reflected if reported on a calendar year basis. Petitioner made its return on the basis of the calendar year. It may be called to attention that the parties have stipulated, without apparent difficulty, the precise amount of petitioner's income under both the "operating road" and "leased road" theories and both on the calendar year basis. In any event, the proof of record falls far short of sustaining respondent's contention. Such evidence as we have and all reasonable inferences tend to support petitioner on the issue.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

LEECH, ARNOLD, and DISNEY concur only in the result.