Leonard Hyatt and Maudie Hyatt, et al. [1] v. Commissioner. Hyatt v. Commissioner
Docket Nos. 60666-60668, 60791, 72370, 72371, 72397.
United States Tax Court
T.C. Memo 1961-318; 1961 Tax Ct. Memo LEXIS 31; 20 T.C.M. (CCH) 1635; T.C.M. (RIA) 61318; November 21, 1961
John Peace, Esq., Majestic Bldg., San Antonio, *32 Tex., and Stanley Schoenbaum, Esq., for the petitioners in Docket Nos. 60666, 60667, 60668, 72370, 72371, and 72397. Fred Woodley, Esq., and Adrian A. Spears, Esq., for the petitioner in Docket No. 60791. John C. Linge, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent determined deficiencies in the income tax of petitioners and additions to tax for the years and in the amounts as follows: Addition to tax
Docket No.
Petitioner
Year
Deficiency
I.R.C. 1939
Sec. 294(d)(2)
60666
Leonard and Maudie Hyatt
1949
$ 8,243.48
1950
4,290.40
1951
4,046.42
$ 475.77
72370
Leonard and Maudie Hyatt
1952
66,390.66
1953
117,217.40
Sec. 291(a)
60667
Eugene and Colleen Treiber
1949
8,216.68
1950
114.50
72371
Eugene and Colleen Treiber
1953
5,330.52
1,332.63
1954
710.54
60668
Ella Mae Plumly
1949
12,103.50
72397
Ella Maie Plumly Lapham
1953
5,578.97
60791
H. C. Plumly
1949
12,103.50
H. C. Plumly, Docket No. 60791, is consolidated herewith for decision. The issues presented for our decision are: (1) whether amounts representing *33 the net proceeds of two one-eighth interests in a general agency contract under which Mercury Life and Health Company, a Texas mutual assessment life insurance agency, was operated are taxable to petitioner Leonard Hyatt for 1949, 1950, and 1951; (2) in the alternative, whether petitioners Ella Maie Plumly and Colleen Treiber realized taxable income in 1949 to the extent of $29,400 each by reason of the execution of instruments of assignment transferring to each of them a one-eighth interest in an agency contract with Mercury Life and Health Company; (3) whether petitioner Leonard Hyatt realized taxable income in 1952 as the result of payments made by Mercury United Life Insurance Company for the purpose of acquiring an outstanding onefourth interest in a management contract with Mercury Life and Health Company; (4) whether amounts received by petitioner Leonard Hyatt upon the disposition of all the stock in Mercury United Life Insurance Company are taxable entirely to him for 1953 as ordinary income; (5) whether amounts received by petitioner Leonard Hyatt upon the assignment to United Security Assurance Company of his general agency contract are properly taxable to him as long-term *34 capital gain or ordinary income; (6) whether or not an installment payment in the amount of $52,375 received by petitioner Leonard Hyatt from Western American Life Insurance Company is taxable to him for either of the years 1952 or 1953; (7) whether a loss sustained by petitioners Eugene and Colleen Treiber on the sale of a house in 1954 was a nondeductible personal expense; and (8) whether petitioners Leonard and Maudie Hyatt are liable for an addition to tax for substantial underestimation of estimated tax for 1951. Other issues raised by the pleadings have been disposed of by agreement or concession of the parties. General Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners Leonard Hyatt and Maudie Hyatt are husband and wife with residence at San Antonio, Texas. They filed joint income tax returns for the years 1949 through 1953 with the director at Austin, Texas. Petitioners Eugene and Colleen Treiber are husband and wife with residence at San Antonio, Texas. They filed joint income tax returns for 1949, 1950, 1953, and 1954 with the director at Austin, Texas. Petitioner Ella Maie Plumly (now Lapham) is a resident of San Antonio, *35 Texas. She and her former husband, petitioner H. C. Plumly, filed a joint income tax return for the year 1949 with the director at Austin, Texas. She filed a separate income tax return for the year 1953 with the director at Austin, Texas. Petitioner Leonard Hyatt in March 1942 purchased from Charles A. McCormick a general agency contract with Mercury Life and Health Company, sometimes hereinafter referred to as Mercury, for $2,500. Mercury is a Texas state-wide mutual assessment life insurance company which at the time of the acquisition of its general agency or management contract by Hyatt was dormant without policies in force or any other assets. In Texas, state-wide mutual assessment life insurance companies, such as Mercury, are nonprofit corporations customarily financed and operated by an individual under a management or general agency contract with the company. See Tex. Ins. Code Ann. art. 13.01 (1952). The individual agent normally is fully responsible for providing the finances necessary for the operations of the business. Such contracts usually provide, in accordance with Tex. Ins. Code Ann. art. 14.25 (1952), that 60 percent of gross premiums must be set aside in a mortuary *36 fund for the payment of claims. Forty percent is available to the owner of the contract or general agent to pay expenses. Any excess belongs to the agent. General agency or management contracts are regarded as separate businesses in Texas, distinct from that of the company itself, and are frequently bought and sold. Issues 1 and 2. Transfer of Interest in Management Contract Findings of Fact Hyatt was without funds with which to commence the operation of the general agency business. His daughter, Ella Maie Plumly, contributed $1,000 cash to the business. She also loaned the agency her automobile which Hyatt used for business purposes for approximately 2 years. These contributions represented the sole initial capital of the business. Ella Maie Plumly also devoted considerable time to assisting her father in the operation of the business. She occupied the company office part of the time and worked both in her home and at the office in preparing policies and handling other cleaical matters connected with the operation of the agency. For these services she received no salary. At the time Ella Maie contributed the $1,000 in cash and the use of her automobile to the agency, it *37 was clearly understood that she was entitled to a onefourth interest in the general agency contract. Hyatt's other daughter, petitioner Colleen Treiber, also worked in the office after school typing policies, answering the telephone, and taking care of correspondence. She was about 16 years of age when she began assisting in the office during 1942 and was paid $6 a week for her work. She worked until 1945 and returned on or about May 1, 1947, continuing until she was married in 1949. The execution of the general agency agreement acquired by Leonard Hyatt in March 1942 was not formally completed until September 1943, because final payment of the purchase price to McCormick had not been made until then. The pertinent provisions of the agreement are as follows: 1. The Company, by authority of its Board of Directors, and in accordance with its By-Laws, does hereby appoint and employ said Agent, the Leonard Hyatt, as its General Agent and representative in all states in which it may be licensed to operate or in which it may in the future become licensed to operate, and does hereby grant unto said Agent the exclusive right and privilege of selling and disposing of all insurance policies *38 to be issued by said Company during the existence of this contract. 2. The Agent, Leonard Hyatt, accepts this appointment as General Agent on the conditions and subject to the limitations herein stipulated and said Agent agrees to manage and conduct said Company's agency business in an efficient and proper manner. 3. All contracts with agents for the sale of policies issued by the Company shall be made by the Company, but shall be subject to the approval of the Agent and the Agent shall determine the amount of commission to be paid to such agents on such policies and such commissions shall be paid to such agents by the Company. 4. The Agent shall supervise all advertising of the Company and shall approve all expenditures of the Company made for that purpose and the Agent shall, from time to time, advance funds to the expense account of the Company to defray expenditures made for that purpose as the Agent may deem expedient. 5. The Company shall, after making proper deductions from all income from its business to the reserve for claims in the proportion determined by law, and after paying all expenses necessary to the proper and usual operations of its business, including taxes, *39 save and except, however, salaries of officers of the Company, pay all surplus funds then remaining to the Agent as compensation to said Agent and for the purposes herein specified. 6. This contract shall become effective from and after the date of execution and shall continue in force for a period of ten years from said date and may be renewed for an additional like period at the option of the Agent, by said Agent's giving notice to the Company of such extension six months in advance of the termination of the first ten year period hereunder by registered mail. 7. It is mutually understood and agreed that this contract may be sold, assigned and transferred by said Agent provided the person or firm to which such sale and assignment may be made is or are competent and that he or they assume all of the obligations and liabilities imposed upon said Agent by the terms of this contract and with the understanding that such sale and assignment be approved by the Board of Directors of the Company at a regular or special meeting. This contract may be cancelled with the mutual consent of all parties interested herein. Under Tex. Ins. Code Ann. art. 14.25 (1952), 60 percent of the gross *40 premiums realized from the sale of insurance policies is required to be allocated to a mortuary fund for the purpose of paying claims, leaving 40 percent of the gross premiums to be retained by the general agent for the purpose of paying management expenses and his own compensation. Frequently the cost of operating the business exceeded the amount available in the expense fund, in which event Hyatt advanced his personal funds to underwrite the expenses of the business. Because of the need for additional financing, William E. Hughes was brought into the business by Hyatt and the board of directors of Mercury. Hyatt transferred 51 percent of the Mercury management contract to Hughes. On May 6, 1944, Hughes executed a management contract with Mercury which did not include Hyatt. Hughes and Hyatt orally agreed that Hughes would transfer a 49 percent interest in the second Mercury contract to Hyatt. A disagreement later developed between Hyatt and Hughes which resulted in an extended series of lawsuits commencing in July 1945. For this reason Hyatt was not active in the affairs of Mercury from July 1945 until April 1, 1947. During that period he received $400 a month as salary, from which *41 he paid $100 each month to Ella Maie Plumly. On April 1, 1947, as the result of the opinion of the Appellate Court of Texas, Hyatt's contract with Mercury was reinstated by the board of directors and the contract executed in favor of Hughes on May 6, 1944, was canceled. On or about April 20, 1947, petitioner H. C. Plumly began to participate in the operation of Mercury. He handled the processing of claims and generally assisted in the office. In addition, Plumly became chairman of the Mercury board of directors. On May 1, 1947, Hyatt executed an agreement assigning one-fourth of the management or general agency contract to H. C. Plumly. The agreement, in pertinent part, reads as follows: This contract entered into on this, the 1st day of May, A.D., 1947, by and between Leonard Hyatt, hereinafter called First Party, and H. C. Plumly, hereinafter called Second Party, WITNESSETH: First Party is the owner of a certain operating contract with Mercury Life & Health Company, dated the 10th day of September, 1943, by the terms of which First Party is given the exclusive right and privilege of managing said company and selling its insurance policies. By the terms of said contract *42 First Party receives for his compensation certain surplus funds remaining with said insurance company after reserves for claims and after paying expenses. First Party desires to transfer a twenty-five per cent (25%) interest in the net earnings of said contract to Second Party. NOW, THEREFORE, I, Leonard Hyatt, for and in consideration of Ten Dollars ($10.00) and other valuable considerations to me in hand paid by H. C. Plumly, the receipt of which is hereby acknowledged, do hereby assign and transfer unto said H. C. Plumly a 25% interest in and to the net proceeds and earnings of said contract above described for the full term thereof including any and all renewals and also assign and transfer a like interest and any other management or operating contract which I may make in the future with the Board of Directors of said company for the management and control of the same. It was the intention of Hyatt and the understanding of Ella Maie Plumly that this written assignment transferred her one-fourth interest in the contract to her husband, H. C. Plumly. Hyatt and Ella Maie regarded Plumly as the manager of the marital community and for that reason the assignment of the one-fourth *43 interest was made in his name. From May 1, 1947, to July 31, 1949, Hyatt paid Plumly one-fourth of the net earnings of Mercury. Amounts received by Plumly representing one-fourth of the agency profits pursuant to the assignment to him of Ella Maie's one-fourth interest were used for their joint living expenses and were reported by them on their joint income tax returns for 1947, 1948, and 1949. Such amounts represented Plumly's sole compensation from Mercury. When marital difficulties arose between Plumly and Ella Maie, the assignment to him of the one-fourth interest in the management contract was "canceled" by Hyatt in July 1949, and Plumly terminated his activities in the management of Mercury. After the cancellation of the assignment to Plumly, the amounts formerly payable to him, representing one-fourth of the earnings under the general agency contract, were deposited by Hyatt in a bank account for the benefit of Ella Maie Plumly and Colleen Treiber. On August 1, 1949, instruments were executed by Hyatt which transferred a one-eighth interest in the Mercury management contract to Ella Maie and a one-eighth interest in the contract to Colleen. Ella Maie had agreed in 1949 to *44 give one-half of her one-fourth interest to Colleen. Thereafter Ella Maie and Colleen each received one-eighth of the net proceeds derived from the Mercury general agency business. On August 20, 1951, Ella Maie and Colleen each conveyed to Leonard Hyatt her one-eighth interest in the Mercury contract in exchange for 300 shares of stock in Mercury United Life Insurance Company. The amounts of $7,500, $10,000, and $7,525 received by Ella Maie and Colleen during 1949, 1950, and 1951, respectively, constituted their shares of the profits attributable to their interests in the Mercury general agency contract. Opinion Petitioners Leonard and Maudie Hyatt on their joint income tax returns for 1949, 1950, and 1951 disclosed the exclusion from their gross income for those years of $7,500, $10,000, and $7,525, respectively. These amounts represented payments made to Ella Maie Plumly and Colleen Treiber during those years pursuant to their contractual interests in the general agency contract held by Hyatt. The respondent has taken the position that these payments are properly taxable to Leonard and Maudie Hyatt during the years in issue rather than to Ella Maie and Colleen as contended *45 by petitioners. It is the respondent's position that neither Ella Maie nor Colleen acquired ownership of an interest in the management contract, and that the oral and written agreements between them and Hyatt purporting to assign percentage interests to them were sham transactions. Since Colleen and Ella Maie performed no services for Hyatt in connection with the operation of Mercury subsequent to August 1, 1949, the respondent contends that the purported assignments to them of one-eighth interests on that date were merely a tax avoidance scheme whereby Hyatt's income would be shifted to his daughters. The record firmly establishes that Hyatt in 1942 agreed with Ella Maie that she was entitled to one-fourth of the net earnings out of the expense fund under the general agency contract in consideration for her $1,000 contribution and the use of her automobile in the agency business. During the early years of the venture, there were no net earnings in the expense fund and neither Hyatt nor Ella Maie received any profit or compensation from the agency. Hyatt found it necessary to advance his own funds to take care of the operating expenses. After William Hughes came into the agency, *46 Hyatt was paid a salary of $400 a month, one-fourth of which consistently was paid by him to Ella Maie from July 1945 to April 1947. Upon settlement of the dispute between Hughes and Hyatt in 1947, a written assignment was executed by Hyatt transferring to H. C. Plumly, Ella Maie's husband, a one-fourth interest in the management contract and entitling him to receive one-fourth of the profits from the agency business. Ella Maie and Hyatt regarded Plumly as the manager of the marital community, and it was understood by them and by Plumly that the one-fourth interest assigned to him on May 1, 1947, was Ella Maie's interest and that she was the beneficial owner thereof. The income resulting from the one-fourth interest was the common property of both Plumly and Ella Maie under Texas law. Tex. Rev. Civ. Stat. Ann. art. 4619. From May 1, 1947, until July 31, 1949, Plumly received one-fourth of the net earnings resulting from the Mercury management contract. These amounts were used for the joint living expenses of Plumly and Ella Maie and were reported by them on their joint income tax returns for 1947, 1948, and 1949. When domestic difficulties arose between Plumly and Ella Maie, the *47 assignment of May 1, 1947, was canceled by Hyatt without objection on the part of Plumly. Amounts representing one-fourth of the earnings of the agency subsequently were deposited by Hyatt in a bank account for the benefit of Ella Maie and Colleen. Prior thereto, Ella Maie had given to her sister Colleen one-half of her interest. On August 1, 1949, in pursuance of his prior grant to Ella Maie of the one-fourth interest, and her gift to Colleen of a one-half interest therein, instruments were executed by Hyatt assigning to Ella Maie and Colleen each a one-eighth interest in the Mercury management contract. The respondent argues that the Mercury general agency contract was a personal service contract and therefore was non-assignable. We are of the opinion that this agreement was not in the nature of a personal service contract during the years here pertinent. The contract expressly provided for its assignment. The general agency or management agreement established a separate business, distinct from that of Mercury. See R. B. Cowden, 34 T.C. 819. Such contracts are frequently bought and sold as businesses in Texas. Cf. Jones v. Corbyn, 186 F. 2d 450; Sammons *48 v. Dunlap, an unreported case ( N.D. Tex. 1952, 44 AFTR 924,). Accordingly we are unable to discover any legal bar to the effective and complete transfer by Hyatt of a percentage interest in the Mercury contract to Ella Maie. There is no evidence of record indicating that Hyatt's agreement with Ella Maie in 1942 or his assignment to Plumly of her interest in 1947 or the subsequent assignments to Colleen and Ella Maie in 1949 were either tax-motivated or lacking in substance. Cf. Higgins v. Smith, 308 U.S. 473; Gooding Amusement Co., 23 T.C. 408, affd. 236 F. 2d 159. We therefore are convinced from the record herein that by May 1, 1947, Hyatt had completely and irrevocably parted with his property interest in one-fourth of the Mercury management contract pursuant to his agreement with his daughter Ella Maie in 1942. He retained only a three-fourths interest in the Mercury contract and the business which it represented. He relinquished to Ella Maie any further right to one-fourth of the agency business. She in turn gave one-half of her interest to her sister Colleen. Since Hyatt did not own any part of this one-fourth interest *49 during 1949, 1950, and 1951 and was entitled to none of the income attributable thereto in those years and since none of the income paid or payable to Ella Maie or Colleen was attributable to his retained three-fourths interest, the decision of the Supreme Court in Lucas v. Earl, 281 U.S. 111, affirming 10 B.T.A. 723, relied upon by respondent, in which the taxpayer undertook by anticipatory arrangement to attribute his earnings to another, is inapplicable. The ownership of an interest in the Mercury management contract was equivalent to the ownership of an interest in the business itself, not merely a right to receive future profits. To the extent of their interests, Ella Maie and Colleen shared the ownership of the business along with Hyatt and were in effect copartners with him. Cf. Commissioner v. Culbertson, 337 U.S. 733; Commissioner v. Tower, 327 U.S. 280. They owned the "tree" on which grew the "fruit" which they received. Therefore none of the income arising from these two one-eighth interests which was received by Ella Maie and Colleen during 1949, 1950, and 1951 is taxable to him for those years. Ella Maie and Colleen *50 each owned a one-eighth interest in the whole business enterprise by way of their interests in the Mercury Life and Health Company management contract during the years in issue. The amounts in question therefore constitute their shares of the profits attributable thereto for those years. As an alternative contention, the respondent argues that in the event we find that Leonard Hyatt made a valid assignment to either or both of his daughters of a percentage interest in the Mercury management contract, such assignment must have been made on August 1, 1949 (not prior thereto), solely as compensation for services rendered by them, and the fair market value of the interest assigned is taxable to them for 1949 under section 22(a) of the 1939 Code. The respondent has determined that the fair market value of a one-eighth interest in the Mercury general agency contract is not less than $29,400 and that such an amount is taxable to H. C. Plumly and Ella Maie Plumly jointly and to Eugene and Colleen Treiber jointly for 1949. The transaction which occurred on August 1, 1949, whereby Leonard Hyatt executed documents of assignment showing the transfer of a one-eighth interest in the management *51 contract to each of his daughters, was simply the formalization of prior contracts. His contract with Ella Maie arose in 1942 when he started business under the Mercury management contract. This agreement was carried out during the period July 1945 to April 1, 1947, when Hyatt consistently paid Ella Maie one-fourth of his monthly salary and was reduced to writing on May 1, 1947, when her one-fourth interest was placed in the possession of her husband as manager of their community property. This assignment became irrevocable not later than May 1, 1947, and Hyatt thereafter retained no ownership rights in her interest and had no right to transfer any part of it to Colleen. The one-eighth interest received by Colleen was transferred by way of gift from Ella Maie, not from Hyatt. Prior to August 1, 1949, Colleen's one-eighth share of the profits realized under the Mercury contract was deposited in a bank account for her benefit and subsequently paid to her. Her rights to one-half of Ella Maie's interest had vested prior to the execution of the written assignment on August 1, 1949. Although Hyatt was the nominal assignor under the assignment of August 1, 1949, Ella Maie is shown by the *52 record to have been the actual donor of Colleen's interest and Hyatt's assignment merely a matter of formalization and convenience. The respondent relies upon that portion of the assignment document which recites that the supporting consideration consists of the services Colleen "has rendered * * * and is to render * * * in the future," and her "monetary expenditures in promoting the * * * business." These recitals appear to have been copied mechanically from the provisions appearing in the assignment to Ella Maie, without modification. Colleen in fact made no monetary expenditure in connection with her father's agency at any time. She did, however, as respondent points out, render clerical services to the partnership between her father and Ella Maie for which she was paid $6 a week. This fact does not prevent the transaction from constituting a gift, however, for a donation made in recognition of past services may nevertheless be a gift. Bogardus v. Commissioner, 302 U.S. 34. Taking the transaction as a whole, we are of the opinion that the transfer to Colleen Treiber of a one-eighth interest in the Mercury management contract vested in her during 1949 at a time *53 prior to August 1 and in reality constituted a gift from her sister Ella Maie and therefore did not represent compensation for services taxable under section 22(a) of the 1939 Code as respondent contends. The one-fourth interest received by Ella Maie vested in her in 1942. Since it represented her equity in the business, we are unable to hold that her receipt thereof represented taxable compensation to her and H. C. Plumly. Issue 3. Acquisition of One-Fourth Interest in Management Contract Findings of Fact Mercury United Life Insurance Company, sometimes hereinafter called Mercury United, a limited capital stock legal reserve company, was incorporated under Texas law on August 20, 1951. Mercury United was organized for the purpose of reinsuring the "Group L" [2] business of Mercury Life and Health Insurance Company. The authorized capital stock was 2,500 shares at a par value of $10 per share. The stock of Mercury United was issued on August 20, 1951, to *54 its shareholders in the amounts as follows: Shareholder
No. of shares
Leonard Hyatt
1,250
Woodville Rogers
625
Ella Maie Plumly
300
Colleen H. Treiber
300
Fred D. Heim
25
Total
2,500 At the time of the organization of Mercury United, Hyatt paid for all of the original capital stock except the shares issued to Woodville Rogers. Rogers was an attorney at law practicing in San Antonio who previously had represented Hyatt. Rogers had been a director of Mercury and had acquired from Hyatt a one-fourth interest in the Mercury management contract on March 31, 1947. Upon the issuance of the 300 shares each to Ella Maie and Colleen, each executed a document conveying her one-eighth interest in the Mercury management contract to Hyatt. In addition to the capital represented by the foregoing shares, $12,500 was contributed to Mercury United as surplus to comply with the requirements of Texas law. [3]
Leonard Hyatt served as president and as one of the directors of Mercury United during the years here pertinent. Subsequent to the organization of Mercury United, he purchased the 625 shares of *55 stock held by Woodville Rogers. Negotiations later were conducted by Hyatt, Rogers, and Charles A. McCormick relating to the possibility of the disposition by Rogers of his one-fourth interest in the general agency contract of Mercury. McCormick offered to purchase the entire general agency contract of Mercury for $175,000, a part of the consideration to be paid in the stock of International Life Insurance Company of Austin, Texas. This offer was rejected by Hyatt. Rogers, however, accepted McCormick's offer and sold him his (Rogers') one-fourth interest in the Mercury management contract for $42,750, of which $22,500 was paid in stock of the International Life Insurance Company at a value of $15 per share. The balance was paid by McCormick in cash and subsequent installments. Subsequent to the acquisition by McCormick of Rogers' one-fourth interest in the Mercury management contract, negotiations were begun to reinsure the Group L business of Mercury by Mercury United. Mercury's Group L business constituted practically all of the business of that company. In order to carry out an acceptable plan of reinsurance, it was considered essential by the officers of Mercury United for Hyatt *56 in behalf of the corporation to acquire the one-fourth interest in the Mercury management contract owned by McCormick. This was considered necessary so as to prevent subjecting Mercury United to a subsequent claim by McCormick (who resided outside of San Antonio) against the reinsured business. Mercury United, however, was financially unable to purchase McCormick's outstanding interest and would have been rendered insolvent had it attempted to do so. On September 12, 1951, Hyatt, on behalf of Mercury United, acquired McCormick's one-fourth interest in the Mercury management contract. The consideration was $42,750, payable $11,750 in cash, a note in the amount of $16,000 payable to McCormick in installments, and the assumption by Hyatt of a $15,000 note owed by McCormick to Rogers. At the time of this purchase, Hyatt was president of Mercury United. On September 14, 1951, the board of directors of Mercury authorized Hyatt, as its president, to negotiate with Mercury United for the purpose of reinsuring with Mercury United all of Mercury's family group (Group L) life insurance. On December 31, 1951, a plan for the reinsurance of Mercury's Group L policies was approved by the boards *57 of directors of both companies and also by the policyholders of Mercury. The plan was then submitted to the Board of Insurance Commissioners of the State of Texas and was approved by it on January 3, 1952. The Board found that the plan would serve the best interests of the Group L policyholders. On January 14, 1952, the board of directors of Mercury United, with Hyatt abstaining authorized the reimbursement to Hyatt of $18,250 which he had advanced the company in purchasing McCormick's one-fourth interest in the Mercury management contract. Mercury United also assumed payment of the amount of $12,000 then due McCormick for his interest, and the further amount of $13,500 still owing to Woodville Rogers. The records of Mercury United disclose payments to Hyatt in the total amount of $35,250 and show such payments on its books under the account heading "Commissions Rogers Contracts." The minutes of Mercury United also designate the foregoing payments as "commissions." Leonard Hyatt was personally enriched to the extent of $625 by the foregoing payments made by Mercury United. Opinion The respondent has taken the position that since Hyatt acquired and retained McCormick's one-fourth *58 interest in the Mercury general agency contract, the payments made to him by Mercury United to the extent of $35,250 are properly includible in the income of Hyatt for 1952 under section 22(a) of the 1939 Code. Petitioners contend that Hyatt acted solely as agent of Mercury United in acquiring McCormick's one-fourth interest and that since all of the Group L policies, which constituted practically all of the business of Mercury, were transferred to Mercury United under the plan of reinsurance, that the value of the Mercury management contract in his hands was reduced to zero and he therefore realized nothing personally from the transaction. It is clear from the testimony presented at the trial that if the outstanding one-fourth interest in the Mercury general agency contract held by McCormick had not been acquired by Hyatt, any plan of reinsurance with Mercury United quite probably would not have been approved by the Texas Board of Insurance Commissioners. The directors of Mercury United believed that they could not have reinsured the Group L business of Mercury unless Hyatt had acquired McCormick's interest. McCormick resided outside of San Antonio and would have held a claim *59 to one-fourth of the premium income in excess of that required to be held as a reserve for claims, had he retained his interest. Mercury United, however, was without funds with which to acquire this outstanding one-fourth interest in order to free its business from a contingent liability to McCormick. Therefore, as the agent of Mercury United and solely on its behalf, Hyatt advanced the necessary funds and assumed certain liabilities as consideration for the acquisition of McCormick's one-fourth interest. Hyatt subsequently was reimbursed by Mercury United for the payments made by him on its behalf. The company also assumed the obligations which Hyatt had originally undertaken as part of the consideration for the purchase of McCormick's interest. Although it is true that Hyatt personally retained the one-fourth interest in the management contract acquired from McCormick, such management contract was of little value after the transfer to Mercury United of the Group L policies reinsured by that company. After the reinsurance of the Group L policies, Hyatt, as owner of the Mercury management contract, was in no better position with respect thereto than he had been originally in 1942 *60 at the time he bought the contract from McCormick and started the business "from scratch." The record does not indicate, except for Hyatt's oral testimony, the value, if any, of the general agency contract after the reinsurance of the Group L policies. According to Hyatt's testimony, it was worthless. However, it was worth at least as much in 1952 as it had been in 1942 when it was acquired by him for $2,500. Hyatt therefore personally benefited from the transaction only to the extent of the value of the one-fourth interest he acquired, which was worth at least $625. The amounts here in issue in excess of $625 represent payments by way of reimbursement from Mercury United to Hyatt as its agent. The payments to him are no different than would have been the case had he made the company a direct loan and subsequently was repaid. Amounts received as repayments of a loan obviously do not constitute taxable income to the lender under section 22(a) of the 1939 Code. Hatboro National Bank, 24 T.C. 786; Boston Elevated Railway Co., 37 B.T.A. 494; and Old Colony Trust Associates v. Hassett, 150 F. 2d 179. Consequently petitioner realized taxable income *61 only to the extent of $625 as a result of the receipt of payments made to him by Mercury United in 1952. Issue 4. Sale of Mercury United Stock Findings of Fact The principal business activity of Mercury United after it had acquired the Group L business of Mercury was with United States servicemen. For the purpose of handling this business, Mercury United employed an experienced insurance agent and spent substantial amounts for advertising, mailing out solicitations, and other methods of attracting business. During January 1953, Hyatt was approached by Robert C. Stark who expressed an interest in purchasing all of the outstanding stock of Mercury United. Hyatt responded that he would be interested in making such a sale only for a price of $100 per share on the 2,500 Mercury United shares outstanding. Stark had been asked to contact Hyatt by Vernon Roberts and Walter Smith, who were the parties who actually desired to acquire the stock. On January 14, 1953, Hyatt negotiated directly with Roberts and Smith, who were officers in the American Casualty and Life Insurance Company. During these discussions relating to the sale of the Mercury United stock, a total price of $250,000 *62 was agreed upon. On January 26, 1953, all of the Mercury United stock owned by Hyatt, his wife, and his two daughters Ella Maie Plumly and Colleen Treiber was transferred to Roberts and Smith by endorsement in blank. Two cashier's checks, totaling $250,000 in face amount were paid to Hyatt and deposited by him in his personal bank account. Hyatt thereafter [4] transferred property valued at $30,000 to each of his daughters representing their shares of the sales proceeds attributable to the 300 shares of Mercury United stock owned by each of them. Ella Maie took her share in the form of municipal bonds and Colleen acquired real estate from Hyatt. He also disbursed to Fred D. Heim $2,500 representing the amount attributable to the 25 shares owned by him. At the time of the reinsurance by Mercury United of Mercury's Group L business on December 31, 1951, Hyatt had no intention of selling his stock or of effecting a reinsurance agreement with any other company. The cost of preparing the reinsurance plan and the necessary actuarial data connected with the reinsurance by Mercury United of the Mercury Group L business amounted to *63 $10,000, and was paid by Hyatt. No commission was involved in connection with the sale of the Mercury United stock to Smith and Roberts on January 26, 1953. The $250,000 received by Hyatt on that date constituted the consideration paid for the sale of the Mercury United stock. Petitioners Leonard and Maudie Hyatt reported the proceeds realized by them from the sale of their 1,875 shares of Mercury United stock as long-term capital gain on their joint income tax return for 1953. The Group L policies in force as of December 31, 1952, totaled $7,899,598 in face amount. These Group L policies were reinsured by the American Casualty and Life Insurance Company on that date with the approval of both the Mercury United board of directors and the board of directors of American. The minutes of the meeting of the board of directors of American on December 31, 1952, authorized the payment to Hyatt of $200,000 "in consideration of reinsurance of the business of the Mercury United Life Insurance Company." The minutes of the American directors' meeting of December 31, 1952, were changed on that day to show that the company was authorized to pay Hyatt $250,000 for the Mercury United stock with *64 the understanding that two of its officers, Vernon Roberts and Walter Smith, would immediately purchase the stock. Opinion The respondent has determined that Hyatt actually owned 2,475 shares of Mercury United stock rather than 1,875 as claimed by him and that he received $200,000 from American on January 26, 1953, by way of commission which was properly taxable to him as ordinary income. Petitioners Leonard and Maudie Hyatt, Ella Maie Plumly, and Colleen Treiber contend that they merely sold the shares of stock which they had held in Mercury United for more than 6 months and that the proceeds realized by them from this disposition of stock clearly represented consideration received for the sale of a capital asset and was taxable as long-term capital gain. The respondent argues that the transaction here involved constituted only the reinsurance of the Mercury United Group L policies by American and that $200,000 of the amount received by Hyatt was actually compensation paid to him for his services in procuring the reinsurance of the Group L policies. The respondent further contends that the reinsurance by American of the Group L policies of Mercury United could have been accomplished *65 by acquiring this business directly from Mercury without the creation of Mercury United and that the creation of Mercury United was an unnecessary "step" which served no business purpose but was done solely to convert into capital gain income which Hyatt in reality received as a commission. It is true that the minutes of American show that its board of directors on December 31, 1952, authorized the payment of $200,000 to Hyatt "in consideration of reinsurance of the business of the Mercury United Life Insurance Company." However, on that same day the American board of directors also authorized the company to pay Hyatt $250,000 for the Mercury United stock with the understanding that two of its officers, Vernon Roberts and Walter Smith, would immediately purchase the stock. The confusing state of the minutes of American and the fact that its board of directors changed the wording of its minutes are not in accord with the original understanding of the parties involved and do not alter the terms thereof. It is uncontradicted in the record before us that neither Hyatt nor Robert Stark nor Roberts nor Smith negotiated for anything other than the sale of the Mercury United stock. The *66 transaction in question was begun as an attempt to purchase the outstanding stock of Mercury United and was completed as a sale of that stock. The record here indicates that the creation of Mercury United was not a sham and that it served a real business purpose. Mercury United was a legal reserve life insurance company incorporated under the laws of Texas for the purpose of reinsuring the Group L business of Mercury, which it proceeded to do with the approval of the Texas Board of Insurance Commissioners. It is unquestioned that Mercury United actively conducted an insurance business. It expended substantial amounts of money for the development and expansion of its insurance operations and hired an experienced employee to develop a program of insurance attractive to United States servicemen. Further, Mercury United was not organized inexpensively simply by the payment of an incorporation filing fee and other nominal charges. The cost of preparing the reinsurance plan and the necessary actuarial data relative to the reinsurance by Mercury United of Mercury Group L business involved the expenditure by Leonard Hyatt of $10,000. Such a sizable expense surely does not indicate a sham *67 transaction. Consequently, we are unable to accept the respondent's contention that the organization of Mercury United was a sham or that its creation in fact served no business purpose. The respondent also asserts that Hyatt personally accepted a $200,000 commission from a company (American) other than the one by which he was employed and performed services on behalf of American in connection with the reinsurance of the Mercury United Group L business. These services were performed in the normal course of his responsibilities as an officer of Mercury United, a regulated insurance company. If, therefore, this had been the actual transaction, Hyatt quite clearly would have been required to reimburse Mercury United for being unjustly enriched, and would also have been subject to removal as an officer of Mercury United, and possibly would have been liable for criminal penalties. Tex. Ins. Code Ann. arts. 14.07, 14.08, 14.55, 14.56 (1952); Milam v. Cooper Co. (Tex. Civ. App.), 258 S.W. 2d 953. It is clear from the record that the transaction here in question in reality constituted a sale by the stockholders of Mercury United of all of their stock in that company in consideration *68 of $250,000. The record further shows that Hyatt personally owned only 1,875 shares. The proceeds received by him on behalf of the other stockholders were subsequently distributed to them in proportion to their stockholdings. Inasmuch as all of the 2,500 shares of stock were capital assets held by the sellers for more than 6 months, the profits realized by the petitioners were properly taxable to them as long-term capital gain under section 117 of the 1939 Code. Issue 5. Assignment of Management Contract Findings of Fact On March 8, 1949, a general agency contract was executed between United Security Assurance Company and Hyatt. United Security was a Texas state-wide mutual assessment life insurance company. Under the terms of this management contract Hyatt was granted the sole and exclusive agency for United Security. The contract called for him to: furnish all necessary office space, office furniture, fixtures, supplies, records and employees to properly operate the business of the Company and to pay all expenses in connection with the operation of the business of the Company except that all properly approved claims under certificates or policies and all attorney's fees *69 and necessary expenses arising out of the defense, settlement or payment of contested claims shall be paid out of the mortuary fund * * * The contract also provided that: upon the termination of this contract all such office furniture, fixtures, supplies and records shall remain the sole and individual property of the said Hyatt and that he shall be compensated by the Company for all good will of the Company and the value of this contract in such amount as may be determined by the Board of Directors. He was to be remunerated from whatever amount remained in the expense fund (40 percent of gross premiums) after the expenses of the business had been paid. The contract also expressly permitted him to sell, assign, or otherwise dispose of it. At the time of execution of the general agency contract with United Security on March 8, 1949, the company had no assets and no business. Hyatt furnished the necessary finances, the office, furniture, fixtures, employees, and personal services necessary to build up the business. On November 8, 1952, United Security and Western American Life Insurance Company of Austin, Texas, entered into an agreement under which Western American agreed *70 to reinsure all of the United Security insurance then in force except its "Group S" [5] business. The consideration to be paid United Security was $72,375. The board of directors of United Security, with Hyatt abstaining, authorized it to enter into an agreement with Hyatt whereby any amount due and payable to the company from Western American would be assigned to him in consideration for his transfer to United Security of his rights in the general agency contract and the insurance business covered thereby except the Group S business. Hyatt and United Security thereupon executed an agreement on November 8, 1952, which provided, in accordance with the authorization of its board of directors, that Hyatt would be entitled to receive the $72,375 payment due the company from Western American in consideration for his transfer to United Security of the general agency contract. The contract provides, in pertinent part, as follows: WHEREAS, Hyatt, by virtue of a contract or agreement with United dated the 8th day of March, 1949, is the General Agent of United and as such is entitled to a substantial income, NOW, THEREFORE, in consideration of United assigning to Hyatt simultaneously with *71 the sale provided for in this agreement, all of its rights and interest to receive payment from Western as follows: (a) Seventy-two Thousand Three Hundred Seventy-five Dollars ($72,375.00) within five (5) days after the approval of a contract of reinsurance as provided in Paragraph 1 of an agreement dated the 24th day of November, 1952, between Western American Life Insurance Company and United Security Assurance Company; Hyatt hereby sells, transfers, conveys and assigns to United all of his rights, including the income to which he is entitled in and to the General Agency Contract. The reinsurance agreement between the two companies was ratified by the policyholders of United Security on November 24, 1952. The Board of Insurance Commissioners of Texas approved the reinsurance agreement *72 on November 26, 1952. On December 3, 1952, Western American issued reinsurance certificates to the policyholders of United Security. The $20,000 amount received by Hyatt in 1952 upon the transfer to United Security of his general agency contract and the $52,375 amount subsequently received by him in 1954 were reported by him as long-term capital gain on his income tax returns for 1952 and 1954, respectively. Opinion The respondent has determined that the amounts totaling $72,375 received by Hyatt from Western American constituted a substitute for ordinary income and was therefore taxable to him as such. Petitioners contend that this amount was received as consideration for the transfer by Hyatt of a capital asset in the form of an insurance business and the proceeds were properly taxable to him as long-term capital gain. At the time Hyatt entered into the general agency agreement with United Security in 1949, the company had no assets and no business. As its general agent, he supplied both the necessary finances and the personal services required to build up the insurance business. He provided an office, furniture, fixtures, and employees. Hyatt was responsible for all of *73 the expenses connected with the operation of the agency business. It is clear from the record that such general agency contracts customarily are regarded in Texas as creating separate businesses apart from the business of the company itself. We have specifically recognized that such general agency contracts with mutual assessment companies are considered to establish separate businesses. R. B. Cowden, 34 T.C. 819. Such general agency contracts customarily are bought and sold in Texas. Although Hyatt's interest in the United Security general agency contract constituted a separate business, we are still faced with the question whether or not that business represents a capital asset within the meaning of section 117(a) of the 1939 Code. A sole proprietorship such as was here operated by Hyatt is not itself a single capital asset under section 117(a) such as the interest of a partner in a partnership business. Williams v. McGowan, 152 F. 2d 570. A sole proprietorship sold as a going business constitutes a sale of the separate assets comprising that business, and the consideration received by the seller therefore must be allocated among all the assets according *74 to the respective values thereof. C. D. Johnson Lumber Corporation, 12 T.C. 348. Accordingly, separate computations must be made of the gain or loss with respect to each asset sold and the resulting gain or loss in each instance must be treated in accordance with the classification of that asset under section 117 or otherwise. Watson v. Commissioner, 345 U.S. 544, affirming 15 T.C. 800; Williams v. McGowan, supra.
The United Security general agency contract is the sole item here in question and we are unable to accept petitioners' contention that it constitutes a capital asset under section 117(a). We cannot regard Jones v. Corbyn, 186 F. 2d 450, cited by petitioners (in which an insurance agency was sold back to the company at capital gain rates), as persuasive authority on this point in the light of more recent cases dealing with the problem of what types of property constitute capital assets under section 117(a). Such decisions as Commissioner v. P. G. Lake, Inc., 356 U.S. 260; Corn Products Co. v. Commissioner, 350 U.S. 46; General Artists Corporation, 17 T.C. 1517, affd. *75 205 F. 2d 360; Roscoe v. Commissioner, 215 F. 2d 478, affirming a memorandum opinion of this Court; and Mansfield Journal Co., 31 T.C. 902, affd., 274 F. 2d 284, hold generally that amounts received pursuant to the sale or assignment of income-producing contracts are taxable to the assignor as ordinary income. We previously have stated in Mansfield Journal Co., supra, at page 910: Petitioner relies on Commissioner v. Covington, 120 F. 2d 768, and Jones v. Corbyn, 186 F. 2d 450. The doctrine of these cases has been overruled by Corn Products Refining Co., supra. * * * Petitioner also relies upon Sammons v. Dunlap, an unreported case ( N.D. Tex. 1952, 44 AFTR 924, par. 9481), which is directly in point, holding that the sale by partners (husband and wife) of a general agency contract with a Texas mutual assessment life insurance company was productive of capital gain. The decision of that court, however, is based upon only a very brief oral opinion without the citation of any statute or case law or any authority whatever. Consequently, we are unable to find any persuasive authority *76 supporting the petitioners' contention that the general agency contract in his hands as sole proprietor constitutes a capital asset and that the amounts received from the assignment thereof to United Security represent long-term capital gain. The consideration received by Hyatt by way of assignment from United Security appears to us to be a substitute for the right to receive ordinary income in the form of premiums in the future. Cf. Nat Holt, 35 T.C. 588, on appeal (C.A. 9, July 17, 1961). When Hyatt assigned to United Security the general agency contract, he relinquished his right to receive such compensation thereunder. The company acquired the right to receive the regular premium income resulting from ownership of the general agency agreement. The assignment agreement executed by Hyatt and United Security on November 8, 1952, states that: Hyatt, by virtue of a contract or agreement with United dated the 8th day of March, 1949, is the General Agent of United and as such is entitled to a substantial income, The contract further provides that: Hyatt hereby sells, transfers, conveys and assigns to United all of his rights, including the income to which he is entitled *77 in and to the General Agency Contract. Therefore, as we view the record here, the amounts totaling $72,375 received by Hyatt from American by way of assignment from United Security were paid for his right to future compensation, not for the acquisition of an income-producing capital asset falling within the ambit of section 117(a) of the 1939 Code. The amounts in question therefore are properly taxable to the petitioner as ordinary income under section 22(a) of the Code. Issue 6. Installment Payment Findings of Fact Hyatt was assignee of the proceeds of the reinsurance contract executed on November 8, 1952, by United Security and Western American Life Insurance Company, under an assignment agreement providing as follows: ASSIGNMENT ASSIGNMENT made this 8th day of November, 1952, by UNITED SECURITY ASSURANCE COMPANY, a Texas corporation with its principal office in San Antonio, Bexar County, Texas, hereinafter called Assignor, to LEONARD HYATT of San Antonio, Bexar County, Texas, hereinafter called Assignee. WHEREAS an agreement of reinsurance dated November 2 [24], 1952, between Western American Life Insurance Company, hereinafter called Western, and Assignor, provides *78 that Western will reinsure all of the insurance which Assignor has in force as of November 24, 1952; and, WHEREAS, Western under the said agreement of reinsurance, has obligated itself to pay Assignor Seventy-two Thousand Three Hundred Seventy-five Dollars ($72,375.00) in consideration for the said reinsurance; and, WHEREAS, Assignee, by virtue of a contract or agreement with Assignor dated the 8th day of March, 1949, is the General Agent of Assignor and as such is entitled to a substantial income. NOW, THEREFORE, in consideration of Assignee selling, transferring, conveying and assigning to Assignor simultaneously with this Assignment all of his rights, including the income to which he is entitled, in and to the General Agency contract, Assignor hereby assigns to the Assignee all of its rights and interest to receiver [receive] payment from Western as follows: (a) Seventy-two Thousand Three Hundred Seventy-five Dollars ($72,375.00) within five (5) days after the approval of a contract of reinsurance as provided in Paragraph 1 of an agreement dated the 24th day of November, 1952, between Western American Life Insurance Company and Assignor. * * *
Under the reinsurance *79 contract, $72,375 was to be paid United by Western American under the following terms: II As consideration of the said reinsurance, Western agrees to pay United the total sum of Seventy-two Thousand Three Hundred Seventy-five Dollars ($72,375.00) payable as follows: a. Western has paid United simultaneously with the exception of this agreement the amount of Two Thousand Five Hundred Dollars ($2,500.00), receipt of which payment shall hereby be acknowledged by United. It is understood and agreed that the said Two Thousand Five Hundred Dollars ($2,500.00) shall be applied as part payment of the total consideration to be paid by Western to United and part payment of the initial payment as mentioned hereafter to be paid by Western to United. If for any reason Western defaults in respect to its obligations under this agreement, the said Two Thousand Five Hundred Dollars ($2,500.00) shall be retained by United as liquidated damages. b. Fifteen Thousand Dollars ($15,000.00) within five (5) days after the approval of the contract of reinsurance as provided in Paragraph I hereof. c. Five Thousand Dollars ($5,000.00) thirty (30) days after the effective date of the contract of reinsurance *80 as provided in Paragraph I hereof, but not later than December 30, 1952. d. Five Thousand Dollars ($5,000.00) upon the 10th day of January, 1953. e. Five Thousand Dollars ($5,000.00) upon the 10th day of each succeeding month until a total of Forty-five Thousand Dollars ($45,000.00) has been paid, and one (1) payment of Two Thousand Three Hundred Seventy-five Dollars ($2,375.00) payable thirty (30) days thereafter paying the total consideration of Seventy-two Thousand Three Hundred Seventy-five Dollars ($72,375.00). * * *
During 1952 Hyatt received $20,000 from Western American pursuant to the foregoing assignment and reinsurance agreement. During the early part of 1953 representatives of Western American contacted Hyatt and requested him to agree to a modification of the terms of the reinsurance contract of November 8, 1952, so as to postpone the 1953 payments until 1954. The representatives of Western American informed Hyatt that the company was unable to make its 1953 payments without placing its business in jeopardy. Hyatt orally accepted the proposed modification of the terms of the reinsurance contract and agreed with Western American to repay to the company in December *81 1953 the full amount of the payments already made and the payments originally scheduled to be made in 1953 totaling $52,375. The purpose of this arrangement was to enable Western American to include the $52,375 amount on its balance sheet for 1953. Hyatt received periodic checks from Western American during 1953 totaling $52,375. Western American's records show the checks issued to Hyatt during 1953 as loans. In accordance with his supplemental agreement with Western American, Hyatt repaid these amounts totaling $52,375 during the latter part of December 1953. In addition, he loaned Western American $50,000. Western American repaid Hyatt $52,375 on January 4, 1954. Hyatt reported his income for the years in issue on a cash receipts basis. He elected to report the proceeds of this sale in his income tax returns on the installment basis. Petitioners Leonard and Maudie Hyatt reported as income $20,000 received from Western American during 1952 on their joint income tax return for that year. They reported on their joint income tax return for 1954 the payment of $52,375 made by Western American to Hyatt on January 4, 1954. Opinion The respondent has taken the position that the *82 entire consideration of $72,375 assigned to Hyatt under the reinsurance contract between United Security and Western American should have been reported as income for 1952. In the alternative, respondent contends that although the amount of $20,000 was properly reported by Hyatt for 1952, the balance of the payments totaling $52,375 should have been reported as income for 1953. The petitioners contend that Hyatt properly reported the amounts of $20,000 and $52,375 for the years 1952 and 1954, respectively. The respondent contends that the entire $72,375 is taxable to Hyatt for 1952, apparently on the theory that the assignment to Hyatt of the proceeds of the reinsurance contract had an ascertainable fair market value in 1952 and was therefore the equivalent of cash in that year. Although the assignment agreement executed November 8, 1952, by Hyatt and United Security was not negotiable in form (see Harold W. Johnston, 14 T.C. 560; Nina J. Ennis, 17 T.C. 465), the record contains evidence indicating that agreements such as this may well have been bought and sold in Texas, related as they were to the sale of a general agency. However, the facts in the case *83 before us are distinguishable from those involved in Frank Cowden, Sr., 32 T.C. 853, reversed and remanded 289 F. 2d 20, in which the taxpayers acquired an advance royalty or bonus contract as part consideration for the execution of a mineral lease to an oil company. There the obligor was clearly able to fulfill its contractual obligation. The taxpayers believed that the bonus agreement had an ascertainable fair market value at the time of its execution. They intended to sell the bonus agreement prior to maturity and in fact did sell it to a bank at a nominal discount shortly after the time of acquisition. The bank which purchased the bonus contract previously had dealt in such agreements and considered them to be "bankable." We there found that the bonus contract in question was readily convertible and was converted to cash and therefore was the equivalent thereof. In the instant case Hyatt did not sell the assignment agreement he acquired from United Security on November 8, 1952. The record does not indicate that he had any intention of selling it prior to maturity or that he had any knowledge of a prospective purchaser. Further, it does not appear that *84 Hyatt believed or that in these circumstances he reasonably could have believed that the assignment contract had an ascertainable fair market value at the time of execution. Hyatt knew that Western American was not in a position to pay cash for the acquisition of the management contract and the insurance business of United Security but could pay the consideration only in future installments. He also had knowledge of the questionable ability of Western American even to make its installment payments under the reinsurance contract. During the early part of 1953 Western American acknowledged that it was unable to fulfill its installment obligations under the reinsurance agreement. We therefore conclude from this record that in an arm's length transaction with full disclosure of all the facts, there would be no market for the assignment contract acquired by Hyatt on November 8, 1952, and it accordingly would have had no ascertainable fair market value on the date of acquisition and cannot be regarded as the equivalent of cash at that time. Petitioners used a cash receipts method of reporting income during the years in issue. They therefore cannot properly be taxed on the entire consideration *85 of $72,375 for the year 1952. The respondent further contends that the installment sales provisions of section 44(b) of the 1939 Code [6] are inapplicable to the instant transaction and that the payments made to Hyatt by Western American in 1953 represented final payment to him of the consideration under the reinsurance agreement and constitute taxable income to him for that year. We agree with these contentions. *86 Inasmuch as the $52,375 amount was a substitute for compensation to Hyatt, as we have held under Issue 5, supra, it is clear that the installment sales provisions of section 44(b) are inapplicable. Charles E. Sorensen, 22 T.C. 321. As an accommodation to Western American and in recognition of that company's inability to make its scheduled payments during 1953 and at the same time show on its balance sheet sufficient assets, Hyatt orally agreed to pay back to the company the full amount of its 1953 payments prior to the end of that year. In accordance with this supplemental agreement with Western American, Hyatt, without legal liability to do so, repaid the entire $52,375 during the latter part of December 1953 and in addition loaned the company $50,000. On January 4, 1954. Western American paid him $52,375. Petitioners insist that the checks issued to Hyatt by Western American were in fact loans to him, and could not be regarded as payment of the company's obligation during 1953. Western American's records show that it recorded its 1953 payments to Hyatt as loans made to him. But for us to regard the transaction in question as a loan by Western American to Hyatt *87 would be to allow ourselves to be deceived by a paper transaction. The record does not indicate that Hyatt requested Western American to lend him money or that he desired to borrow at all. If he had any need to borrow funds, the record fails to disclose it. It is not shown that he gave the company a note or any other evidence of indebtedness. No interest was paid by Hyatt or agreed upon by the parties. From what is shown on this record, Western American would have been unable legally to enforce collection from Hyatt of any amount "borrowed" by him in 1953. Due to the lack of compulsion on the part of Hyatt to accept such payments as loans and the lack of execution of any promissory note or other evidence of debt, the absence of any showing of Hyatt's need or desire to borrow money, and the unenforceable character of the transaction from the standpoint of Western American, petitioners have failed to convince us that the exchange of checks between the company and Hyatt in 1953 constituted an actual borrowing of funds by him from Western American. The series of payments and repayments between Hyatt and Western American constituted a mere paper transaction executed solely for the benefit *88 of Western American and as a loan to Hyatt has no reality from an income tax standpoint. This transaction may well have represented a loan by Hyatt to Western American but it by no means constituted a loan by the company to him. The installment purchase payments totaling $52,375 due Hyatt from Western American during 1953 were paid him in full in that year and were properly includible as income on his 1953 return. Issue 7. Sale of House Findings of Fact Petitioners Eugene and Colleen Treiber were engaged in the business of building homes for sale during 1952 and 1953. Eugene Treiber was an architect and was engaged in the business of both designing and building residences. He built three or four homes for sale during 1952 and 1953. During 1952 petitioners constructed a house located at 216 Newberry Terrace, San Antonio, Texas, at a cost of $30,000 and offered it for sale. The house was listed with a realtor at the time construction was commenced and was held for sale throughout the period of its construction and for a period of 6 to 8 months after its completion. The house was advertised in the newspaper during the entire period of construction and the following 6 to 8 months *89 but without success. Because of the failure of the house to sell, the realtor with whom the property was listed advised petitioners to move into the house so as to look after it and enhance the possibility of its sale. They were living at this time at another residence in San Antonio and had no intention of occupying the newly constructed house. However, in the interest of maintaining the property and assisting in its sale, they followed the advice of the realtor and moved into the newly constructed dwelling. They continued their efforts to dispose of the property after they occupied it in June 1953. They were finally successful in selling the property in September 1954 for $27,500 and moved out of the house on September 27, 1954. Selling expenses totaled $1,565.97. The sale of the house during 1954 resulted in a loss to petitioners in the amount of $4,065.97. This amount was claimed by petitioners as ordinary loss on their income tax return for 1954. Opinion The respondent has taken the position that the foregoing loss claimed by petitioners on their return for 1954 in the amount of $4,065.97 is a personal loss and is therefore not deductible. His contention, however, that the *90 property in question was occupied and sold solely as a personal residence of petitioners is without support in the record before us. The uncontradicted testimony is to the effect that the house was constructed by petitioners during 1952 in the normal course of their business of designing, constructing, and selling dwelling houses. From the commencement of its construction in 1952 until the time of its disposition in 1954, the house was held for sale. Petitioners primarily did not intend to occupy it for personal reasons. They occupied the property solely on the advice of their realtor for the purpose of enhancing the possibility of selling it. Since the predominant purpose of petitioners in constructing and occupying the house here in question was to realize a profit by its sale, the residential use of the property was incidental and under our decisions the loss incurred upon its sale is deductible. Marjorie G. Randall, 27 B.T.A. 475; Minnie L. Campe, 17 B.T.A. 575; Henry J. Gordon, 12 B.T.A. 1191; cf, Dupuy G. Warrick, 44 B.T.A. 1068. Accordingly, we are of the opinion that the loss incurred on the sale of the house in question *91 during 1954 was either a loss incurred by petitioners in the ordinary course of their business or a loss resulting from a transaction entered into for profit, and is therefore deductible under section 165(c) of the 1954 Code. Issue 8. Addition to Tax Under Section 294(d)(2) for Substantial Underestimation of Estimated Tax Findings of Fact The income tax liability of petitioners Leonard and Maudie Hyatt for 1951 as shown on their joint income tax return for that year is $11,964.02. Their tax liability for 1951 if computed under tax rates applicable to 1950 would be $10,583.78. Eighty percent of that amount is $8,467.02. They made estimated income tax payments for 1951 as follows: April 13, 1951
$1,400
July 3, 1951
1,400
September 24, 1951
1,400
January 15, 1952
3,800
Petitioners' income tax liability for 1950 as shown in their joint return for that year is $6,512.26. One-fourth of that amount is $1,628.06. Opinion The respondent has determined an addition to tax for substantial underestimation of petitioners' estimated tax for 1951 under section 294(d)(2) of the 1939 Code. Apart from petitioners' payments of estimated tax for 1951, which were stipulated, *92 they have offered no evidence with respect to this issue and do not argue or otherwise mention it on brief. Their declaration of estimated tax for 1951 is not in evidence, and we are not apprised of their declared estimated tax liability for 1951 or the basis for its computation. If they had computed their 1951 estimated tax on the basis of facts shown on their 1950 return, their estimated tax for 1951 would have been $6,512.26 and their quarterly payments $1,628.06. See L. M. Steiner, 25 T.C. 26. Instead their quarterly payments were $1,400 for each of the first three quarters. Since petitioners clearly did not make their quarterly payments of estimated tax on the basis of facts shown on their return for 1950 and since 80 percent of their tax liability for 1951 if computed under rates applicable to 1950 would be $8,467.02, an amount greater than the total payments of estimated tax amounting to $8,000, they did not comply with the requirements of section 294(d)(2) and respondent's determination of an addition to tax thereunder must be sustained. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: EUGENE TREIBER and COLLEEN TREIBER, Docket No. 60667; ELLA MAE PLUMLY, Docket No. 60668; H. C. PLUMLY, Docket No. 60791; LEONARD HYATT and MAUDIE HYATT, Docket No. 72370; EUGENE F. and COLLEEN H. TREIBER, Docket No. 72371; and ELLA MAIE PLUMLY LAPHAM, Docket No. 72397.↩
2. "Group L" consisted of family group life insurance contracts and comprised nearly all of the Mercury policies. The record is silent as to the purpose in creating this group and the time and manner of its creation.↩
3. The record does not disclose by whom the amount was contributed.↩
4. The record is silent as to how soon thereafter.↩
5. "Group S" was a group of policyholders formed shortly after September 25, 1952, pursuant to the authorization of the United Security board of directors for the purpose of retaining in the company the minimum number of policyholders required under Texas law to qualify for an operating charter. As of November 24, 1952, Group S had more than 1,000 members with assets in excess of $2,000.↩
6. SEC. 44. INSTALLMENT BASIS. * * *
(b) Sales of Realty and Casual Sales of Personality [Personalty]. - In the case (1) of a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year), for a price exceeding $1,000, or (2) of a sale or other disposition of real property, if in either case the initial payments do not exceed 30 per centum of the selling price (or, in case the sale or other disposition was in a taxable year beginning prior to January 1, 1934, the percentage of the selling price prescribed in the law applicable to such year), the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this section. As used in this section the term "initial payments" means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made.↩